1 | Aram Ordubegian (SBN 185142)
Andy S. Kong (SBN 243933)
2 | **ARENT FOX LLP**
555 West Fifth Street, 48th Floor
3 | Los Angeles, CA 90013-1065
Telephone:    213.629.7400
4 | Facsimile:    213.629.7401
aram.ordubegian@arentfox.com
5 | andy.kong@arentfox.com

6 | Attorneys for Plaintiff

7 |

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | **LOS ANGELES DIVISION**

11 |

| | |
|---|---|
| In re | Case No. 2:14-bk-21070-WB |
| **HOLY HILL COMMUNITY CHURCH,** | Chapter 11 |
| Reorganized Debtor. | Adv. No. |
| | |
| **RICHARD J. LASKI**, Principal of Reorganized Debtor, | **ADVERSARY COMPLAINT** |
| Plaintiff, | Status Conference: |
| | Date:    [TO BE SET] |
| vs. | Time:    [TO BE SET] |
| | Place:    Courtroom 1375 |
| **PALISADES CAPITAL PARTNERS, LLC, 1111 SUNSET BOULEVARD, LLC, 1111 SUNSET, LLC, DOWNTOWN CAPITAL, LLC, METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA,** | 255 E. Temple St. Los Angeles, CA 90012 |
| Defendants. | [SUMMONS TO BE ISSUED] |

1  Plaintiff Richard J. Laski, the Principal of the Reorganized Debtor (the "Principal"),

2  respectfully represents and alleges against defendants (collectively referred to as the

3  "Defendants") Palisades Capital Partners, LLC, a California limited liability company

4  ("Palisades"), and 1111 Sunset Boulevard, LLC, a Delaware limited liability company ("Sunset

5  Boulevard" and together with Palisades, collectively referred to hereinafter as the "Purchaser"),

6  and 1111 Sunset, LLC, a California limited liability company ("Sunset LLC"), Downtown

7  Capital, LLC, a California limited liability company ("Downtown Capital"), and Metropolitan

8  Water District of Southern California, a public agency of the State of California (the "MET"), the

9  following:

10  **PRELIMINARY STATEMENT**

11  Pursuant to this adversary complaint, the Principal seeks a determination from this Court

12  concerning the nature and scope of claims, if any, that were sold, transferred, and/or assigned to

13  the Purchaser pursuant to the Sections 1.1(f) and 1.3 of the Palisades PSA (defined below).

14  **JURISDICTION AND VENUE**

15  1.  This adversary proceeding arises out of and relates to the chapter 11 case of Holy

16  Hill Community Church (the "Debtor"), entitled *In re Holy Hill Community Church*, which is

17  now pending before the United States Bankruptcy Court for the Central District of California,

18  Case No. 2:14-bk-21070-WB.

19  2.  The Debtor filed a voluntary chapter 11 petition on June 5, 2014 (the "Petition

20  Date").

21  3.  Richard J. Laski, the chapter 11 trustee (the "Chapter 11 Trustee") was previously

22  appointed by the Office of the United States Trustee as the chapter 11 trustee of the Debtor's

23  bankruptcy estate (the "Estate") by Order of this Court entered on June 30, 2014.

24  4.  On December 17, 2015, this Court entered its Order Confirming the Chapter 11

25  Trustee's Second Amended Chapter 11 Plan [Dkt No. 398] (the "Confirmation Order").  The

26  Confirmation Order became final on January 1, 2016, and the Plan became effective on January

27  1, 2016 (the "Effective Date").  On the Effective Date, the Debtor became the Reorganized

28

1

1  Debtor and the Chapter 11 Trustee became the Principal of the Reorganized Debtor pursuant to

2  the Chapter 11 Trustee's Second Amended Plan of Reorganization and Confirmation Order.

3    5. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§

4  157 and 1334 and pursuant to Section 11.10.6 of the Palisades PSA (defined below) which

5  specifically provides that "The Bankruptcy Court shall retain exclusive jurisdiction to enforce the

6  provisions of this Agreement." Moreover, the Sale Order (defined below) states that "The

7  Bankruptcy Court retains jurisdiction to (a) interpret, implement and enforce the terms and

8  conditions of this Order; and (b) resolve any disputes arising under or related to this Order." *See*

9  Dkt No. 268 at ¶ 26.

10    6. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

11    7. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2), and

12  the Court can and should enter final judgment.  To the extent that this proceeding is non-core or

13  that, absent the consent of the parties, this Court does not have the power to enter final orders or

14  judgment in this proceeding, the Principal consents to entry of final orders or judgment by this

15  Court.

16         **THE PARTIES**

17    8. The Principal is the sole fiduciary of the Reorganized Debtor pursuant to the Plan

18  and Confirmation Order which became effective on January 1, 2016.

19    9. The Principal alleges on information and belief that defendant Palisades Capital

20  Partners, LLC ("Palisades"), is a California limited liability company organized and existing

21  under the laws of the State of California, having its principal place of business located at 11766

22  Wilshire Boulevard, Suite 1150, Los Angeles, California 90025.

23    10. The Principal alleges on information and belief that defendant 1111 Sunset

24  Boulevard ("Sunset Boulevard") is a Delaware limited liability company conducting business

25  within the State of California and is Palisades' assignee under the Palisades PSA.  1111 Sunset

26  Boulevard maintains an office at 11766 Wilshire Boulevard, Suite 1150, Los Angeles, California

27  90025.

28

2

AFDOCS/12909886.1

11.    The Principal alleges on information and belief that defendant Sunset LLC[1] is a California limited liability company organized and existing under the laws of the State of California, having its principal place of business located at 1855 Industrial Street, Unit 106, Los Angeles, California 90021.

12.    The Principal alleges on information and belief that defendant Downtown Capital is a California limited liability company organized and existing under the laws of the State of California, having its principal place of business located at 2121 East 7th Place, Unit 104, Los Angeles, California 90021.

13.    The Principal alleges on information and belief that defendant MET is a public agency of the State of California, organized and existing under the Metropolitan Water District Act of the State of California.

## FACTUAL ALLEGATIONS

14.    On September 6, 2013, the Debtor commenced a civil action styled *Holy Hill Community Church v. Yuval Bar-Zemer, et al.*, Case No. BC520596 (the "Bar-Zemer Action") in the Los Angeles Superior Court.  Debtor's complaint in the Bar-Zemer Action sought relief against defendants Bar-Zemer, Sunset LLC, and Downtown Capital, Chan Hyo Tak ("Tak"), Hae Hoon Owh aka Nery Owh ("Owh"), and Sung Yeol Yim ("Yim").

15.    On March 20, 2014, the Debtor filed an Amended Complaint in the Bar-Zemer Action against Yuval Bar-Zemer ("Bar-Zemer"), Sunset LLC, Downtown Capital, the MET, Tak, Owh, and Yim, seeking, *inter alia*, compensatory damages and rescission.

16.    On June 5, 2014, Debtor filed its petition for relief under the Bankruptcy Code in this Court.

17.    The Chapter 11 Trustee timely removed the Bar-Zemer Action to this Court on August 31, 2015, as adversary proceeding case number 2:15-ap-01467-WB.  The instant adversary complaint seeks to adjudicate, among other rights, which, if any, of the claims alleged in the removed Bar-Zemer Action now belong to Purchaser pursuant to the terms of the Palisades PSA described below.

---

[1] 1111 Sunset, LLC has no relation to or affiliation with Defendant 1111 Sunset Boulevard, LLC.

AFDOCS/12909886.1

18.      Following the Chapter 11 Trustee's appointment, after meeting with the various parties-in-interest in the bankruptcy case, the Chapter 11 Trustee determined that the appropriate exit strategy was to sell the Debtor's real property located at 1111 W. Sunset Boulevard, Los Angeles, California (the "Property") for the benefit of creditors and in order to fulfill the Debtor's mission under its Articles of Incorporation.

19.      Accordingly, the Chapter 11 Trustee employed CBRE, Inc. as the Estate's real estate broker and worked tirelessly with his brokers to market and sell the Property.  After an exhaustive marketing campaign, the Chapter 11 Trustee entered into a Purchase and Sale Agreement (the "Stalking Horse PSA") with Sunset LLC, a true and correct copy of which is attached hereto as **Exhibit "A"**.[2]

20.      Shortly thereafter, on March 4, 2015, the Chapter 11 Trustee filed proposed bidding procedures (the "Bidding Procedures") as well as a Motion for (among other things) an Order Approving Procedures in Connection with the Proposed Sale of Property of the Estate.

21.      The Chapter 11 Trustee's Motion came on for hearing in this Court on April 9, 2015.  At the hearing, counsel for the MET requested that the Chapter 11 Trustee clarify on the record whether or not the Chapter 11 Trustee and the stalking horse bidder (Sunset LLC) intended to sell certain litigation rights as part of the sale, including the claims pending in the Bar-Zemer Action.  The Chapter 11 Trustee and Sunset LLC stated on the record that such claims were not included in the sale and indeed, it was never the Chapter 11 Trustee's intent to sell these litigation rights as part of the sale.  Following the hearing, the Chapter 11 Trustee's Motion was approved in its entirety by order of this Court entered on May 6, 2015.  A true and correct copy of portions of the hearing transcript from the April 9, 2015 hearing is attached hereto as **Exhibit "B"**.

22.      On or about May 1, 2015, the Chapter 11 Trustee filed a motion seeking authority to sell the Property (the "Sale Motion") pursuant to the Stalking Horse PSA to the stalking horse buyer, Sunset LLC.  *See* Dkt No. 206.

23.      The Chapter 11 Trustee and his brokers solicited overbids, and Palisades timely

---

[2] Sunset LLC exercised its right of first refusal after the Chapter 11 Trustee initially entered into a purchase and sale agreement with another party (the "Original PSA") and became the "stalking horse buyer."

4

submitted an overbid which included a purchase and sale agreement with modifications (the "Palisades PSA"), which had been approved by the Chapter 11 Trustee, from the Stalking Horse PSA. At a lively auction conducted in open court on May 22, 2015, Palisades submitted a successful overbid of $29,750,000.00.

24.    The Chapter 11 Trustee filed the Palisades PSA entered into with the Palisades on June 10, 2015. *See* Dkt No. 251.

25.    On July 7, 2015, the Bankruptcy Court entered the *Order (1) Authorizing the Sale of Property of the Estate Under 11 U.S.C. § 363 Free and Clear of All Liens, Claims, and Encumbrances, Subject to Higher and Better Offers; (2) Approving the Purchase and Sale Agreement; (3) Approving Assumption and Assignment of Certain Unexpired Leases and/or Executory Contracts and Determining Cure Amounts, Or, In the Alternative, Approving the Rejection of Unexpired Leases and/or Executory Contracts; and (4) Approving the Form and Manner of Notice* (the "Sale Order"). Prior to the sale closing, Palisades assigned its rights under the Palisades PSA to Sunset Boulevard. The sale to Sunset Boulevard closed on August 5, 2015.

26.    After the sale closing, issues have arisen concerning certain assets that may have or may not have been sold, transferred, and/or assigned to the Purchaser pursuant to the Palisades PSA, including the claims that are in litigation in the removed Bar-Zemer Action. The key provisions of the Palisades PSA at issue in this adversary complaint are sections 1.1(f) and 1.3. Section 1.1(f) of the Palisades PSA provides in pertinent part as follows:

> As used herein, the "Property" means, collectively, the following, expressly excluding any Excluded Property ... (f) to the extent transferrable and subject to any waivers granted or settlements entered into by Seller prior to the Effective Date, any and all claims against governmental entities, present and former owners of real property adjacent to the Property, present and former tenants of the Property and all rights, claims and causes of action Seller may have against third parties for negligence, gross negligence, willful misconduct or fraud in connection with the design or construction of the Improvements, but subject to Section 1.3 below, expressly excluding the Reserved Claims (collectively, the items in Section 1.1(f), the "Intangible Property").

27.    Section 1.3 of the Palisades PSA states in part that "Buyer acknowledges that any claims related to transfers that are preferences under the Bankruptcy Code and claims related to

5

1 the enforceability of the Reciprocal Use Agreements (collectively, the 'Reserved Claims'), shall

2 not be conveyed to Buyer at Closing."

3       28.    Pursuant to Section 1.3 of the Palisades PSA, the Purchaser had an option to

4 purchase the Reserved Claims which the Purchaser timely exercised on or about November 18,

5 2015. Accordingly, under the terms of the Palisades PSA, the Chapter 11 Trustee sold, conveyed,

6 and assigned to Purchaser the Reserved Claims.

7       29.    The Purchaser also filed on November 4, 2015, a motion to intervene in the Bar-

8 Zemer Action seeking to prosecute claims on behalf of the Chapter 11 Trustee in the Bar-Zemer

9 Action to the extent they were transferred to the Purchaser under the terms and conditions of the

10 Palisades PSA. That motion remains pending.

11       30.    Purchaser has interpreted Sections 1.1(f) and 1.3 of the Palisades PSA as including

12 an assignment and grant to the Purchaser of, *inter alia*, all claims the Debtor, the Chapter 11

13 Trustee, or the Estate have against the defendants in the Bar-Zemer Action including Sunset LLC,

14 Yuval Bar-Zemer, Downtown Capital, the MET, Tak, Owh, and Yim. On the other hand, the

15 Principal is informed that Sunset LLC, Downtown Capital, Bar-Zemer, and the MET interpret

16 Sections 1.1(f) and 1.3 much more narrowly, and that, *inter alia*, the Purchaser's litigation rights

17 against third parties pursuant to Section 1.1(f) is strictly limited by the phrase "in connection with

18 the design or construction of the Improvements". Section 1.1(f) of the Palisades PSA was

19 included in the Original PSA, the Stalking Horse PSA, and the Palisades PSA.

20 **CAUSE OF ACTION FOR DECLARATORY RELIEF PURSUANT TO**

21 **28 U.S.C. §§ 2201 AND 2202, 11 U.S.C. § 541, AND CALIFORNIA CODE OF**

22 **CIVIL PROCEDURE § 1060, ET SEQ.**

23 (Against All Defendants)

24       31.    The Principal re-alleges and incorporates here by reference as though again fully

25 set forth, paragraphs 1 through 30 of this Adversary Complaint.

26       32.    The Principal alleges on information and belief that an actual controversy has

27 arisen between the Defendants in which the Principal contends that the Purchaser interprets

28 Sections 1.1(f) and 1.3 of the Palisades PSA as including an assignment and grant to the

6

Purchaser of, *inter alia*, to proceed in the Bar-Zemer Action on all claims the Debtor, the Chapter 11 Trustee, or the Estate have against the defendants in the Bar-Zemer Action including Sunset LLC and its affiliates, Yuval Bar-Zemer and Downtown Capital, and the MET, and for other reasons heretofore stated. Sunset LLC, Bar-Zemer, Downtown Capital, and the MET take the contrary position and assert Sections 1.1(f) and 1.3 are much more narrow, and that, *inter alia*, the Purchaser's litigation rights against third parties pursuant to Section 1.1(f) is strictly limited by the phrase "in connection with the design or construction of the Improvements."

33.    It was not the intent of the Chapter 11 Trustee to sell litigation rights as part of the sale of the Property as evidenced at the hearing to approve the Bidding Procedures (see **Exhibit B**). However, the Chapter 11 Trustee understands why the parties and particulary Palisades may believe certain litigation rights may have been sold, conveyed, or otherwise transferred to Palisades pursuant to the Palisades PSA especially since the language in section 1.1(f) of the Palisades PSA was also in at least two prior purchase and sale agreements, as noted above.

34.    Accordingly, a declaration from this Court adjudicating the rights between the Defendants and the Principal with respect to the Palisades PSA and more specifically, the scope and nature of the Intangible Property sold, assigned, or otherwise transferred to the Purchaser pursuant to Section 1.1(f) of the Palisades PSA is necessary and appropriate in order for the Principal to be able to perform his duties under the Bankruptcy Code, the Palisades PSA, the Sale Order, and the Confirmation Order. The foregoing determination is also necessary because the Chapter 11 Trustee reserved Five Hundred Thousand Dollars ($500,000) under the Plan and the Settlement Agreement entered into between the Chapter 11 Trustee and Downtown Capital parties for reasonable legal fees that may be incurred by the Downtown Capital parties in defense of claims, if any, that may have been sold or assigned to third parties; namely, the Purchaser. Once the scope and nature of the Intangible Property rights are determined, the $500,000 reserve will either flow to the benefit of the Reorganized Debtor or be kept in reserve for the benefit of the Downtown Capital parties.

35.    As a result of the foregoing, the Principal requests a declaratory relief judgment on

the scope and nature of the Intangible Property sold, assigned, or otherwise transferred to the Purchaser pursuant to Section 1.1(f) of the Palisades PSA.

## PRAYER FOR RELIEF

**WHEREFORE**, the Principal prays for judgment as follows:

*As To The Principal's Cause Of Action For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202, 11 U.S.C. § 541, And California Code Of Civil Procedure § 1060, Against All Defendants:*

    1.    For a declaration concerning the scope and nature of the Intangible Property sold, assigned, or otherwise transferred to the Purchaser pursuant to Section 1.1(f) and 1.3 of the Palisades PSA; and

    2.    For such other relief as the Court deems just and proper.

DATED: February 1, 2016        Respectfully submitted,
**ARENT FOX LLP**


By:  /s/  Andy/S. Kong
       ANDY S. KONG
       Attorneys for Plaintiff

AFDOCS/12909886.1

# EXHIBIT A

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made and entered into as of the 2nd day of April, 2015 (the "**Effective Date**"), by and between RICHARD J. LASKI, in his capacity as chapter 11 trustee of Holy Hill Community Church ("**Debtor**") (in such capacity, "**Seller**") and 1111 SUNSET, LLC, a California limited liability company, or its permitted assignee ("**Buyer**").

### R E C I T A L S

A.      Debtor has filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**").

B.      Seller is the duly authorized and appointed trustee of the chapter 11 estate of Debtor, which estate owns the "Property" (as hereinafter defined) under Section 541 of the Bankruptcy Code, which Property consists of, among other things, approximately 5.29 acres of land commonly known as "Holy Hill Community Church", located in Los Angeles, California, and more particularly described on Exhibit "A".

C.      Seller believes, following consultation with its financial advisors and consideration of available alternatives, that, in light of the current circumstances, a sale of the Property as provided herein is necessary and is in the best interests of Seller and Debtor's creditors.

D.      Seller entered into that certain Purchase and Sale Agreement, (the "**Original Agreement**") dated March 2nd, 2015, with 1111 Sunset Associates, LLC, a Delaware limited liability company ("**Associates Buyer**").

E.      In accordance with the Right of First Refusal (the "**ROFR**") that Buyer contends is granted to Buyer under the Reciprocal Use Agreements (as defined below), the Original Agreement provided that Buyer would be entitled to exercise its Right of First Refusal to acquire the Property, in which event the Original Agreement would terminate.  Buyer contends it has timely and properly exercised the ROFR.

F.      Seller now desires to sell the Property to Buyer on the terms and conditions hereinafter documented and Buyer desires to purchase the Property on the terms and conditions hereinafter documented.

9

G.     The execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of a final, non-appealable Sale Order under Sections 363 and 365 of the Bankruptcy Code authorizing the sale of the Property by Seller to Buyer on the terms and conditions set forth herein.

H.     Seller and Buyer desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.     Purchase and Sale.  Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Property on the terms and conditions hereinafter set forth without representation or warranty other than those expressly set forth herein .

1.1     Property.  As used herein, the "**Property**" means, collectively, the following, expressly excluding any Excluded Property and any right to the name "Holy Hill Community Church" or any derivations thereof: (a) that certain land described in Exhibit "A", together with all easements, rights-of-way, and appurtenances benefiting such land (the "**Land**"), (b) all improvements, structures and fixtures now or on the "Closing Date" (as hereinafter defined) located upon the Land (the "**Improvements**"), (c) any air rights associated with the operation and maintenance of the Land and the Improvements, (d) all tangible personal property now or on the Closing Date located on or used in connection with the Land and Improvements other than the Excluded Property (the "**Personal Property**"), (e) Seller's interest in all "Leases" (as hereinafter defined) expressly set forth at Exhibit "G", including without limitation all security deposits thereunder, which shall be part of the "Leases", (f) Seller's right, title and interest in all "Service Agreements" (as hereinafter defined) expressly set forth at Exhibit "I", governmental permits, entitlements, entitlement applications and licenses related to the Land, Improvements or Personal Property and other approvals, indemnification agreements, warranties and guarantees that Seller has received or applied for in connection with any work or services performed with respect to, or equipment installed in, the improvements on the Land, and (g) to the extent transferrable and subject to any waivers granted or settlements entered into by Seller prior to the Effective Date, any and all claims against governmental entities, present and former owners of real property adjacent to the Property, present and former tenants of the Property and all rights, claims and causes of action Seller may have against third parties for negligence, gross negligence, willful misconduct or fraud in connection with the design or construction of the

Improvements, but expressly excluding any claims related to preferential transfer rights and claims arising from any declarations, covenants, easements, or restrictions encumbering the Property, including the Reciprocal Use Agreements (hereinafter defined) (collectively, the items in Section 1.1(f) and 1.1(g), the "**Intangible Property**"). For the avoidance of doubt, Buyer shall not assume any liabilities of Seller in connection with the Property or otherwise. In addition, Buyer shall only assume those Leases, Service Agreements and any other executory contracts, if any, that are expressly set forth at Exhibit "B" (the "**Assumed Contracts**"), which Assumed Contracts shall be assumed and assigned by Buyer pursuant to Section 365 of the Bankruptcy Code.

1.2     Excluded Property. Buyer acknowledges that certain fixtures and personal property shall not be conveyed to Buyer (collectively, the "**Excluded Property**"). Buyer and Seller shall negotiate in good faith to finalize the list of Excluded Property prior to the date on which the Sale Procedure Order hearing shall be held. Such Excluded Property shall be expressly excluded from the Bill of Sale. Buyer hereby grants Seller a license permitting (i) the Excluded Property to remain on the Land and within the Improvements for a period of no longer than ninety (90) days after the Closing Date, and (ii) Seller or its agents to enter the Land and the Improvements following the Closing Date in order to remove the Excluded Property. Buyer agrees to reasonably cooperate with Seller in order to grant Seller or its agents access to the Land and the Improvements in connection with the license granted under this Section 1.2. This Section 1.2 shall survive Closing and recording of the Deed.

1.3     Post-Closing Claims. Buyer acknowledges that any claims related to preferential transfer rights and claims arising from any declarations, covenants, easements, or restrictions encumbering the Property, including the Reciprocal Use Agreements, shall not be conveyed to Buyer. After the Closing Date, Buyer hereby agrees to cooperate with the reasonable request of Seller in connection with Seller's pursuit, litigation, and enforcement of such claims, including, to the extent necessary by virtue of Seller's ownership of the Property, making submittals and other court filings on Buyer's behalf, which submittals and other court filings shall be at the sole cost of Seller. To the extent that the pursuit by Seller of post-closing claims could affect the process of entitling the Property, Seller agrees to consult with Buyer and cooperate in good faith with Buyer regarding the pursuit of such claims. This Section 1.3 shall survive Closing and recording of the Deed.

2.     Purchase Price. The purchase price shall be payable in accordance with one of the following two options, which shall be subject to the election of Seller in its sole and absolute discretion, as provided for in this Section 2:

11

2.1   Additional Payment Option. Should Seller elect to have the Purchase Price paid in accordance with the terms of this Section 2.1 (the "**Additional Payment Option**") then in such event, the purchase price for the Property (the "**Additional Payment Purchase Price**") shall consist of a fixed initial payment (the "**Initial Payment**") and an additional payment calculated in accordance with Section 2.1.2 (the "**Additional Payment**").

2.1.1   Initial Payment. The Initial Payment shall equal Sixteen Million and No/100 Dollars ($16,000,000.00).

2.1.2   Additional Payment. The Additional Payment shall be calculated as follows:

(a)   Subject to Section 2.1.2 (c), if Residential Units (as hereinafter defined) are to be constructed on the Property, and Entitlements with respect to Entitled Residential Units (as hereinafter defined) have been obtained, then the Additional Payment with respect to such Residential Units shall be equal to (A) Twenty Thousand and No/100 Dollars ($20,000.00) for each Entitled Residential Unit approved to be built in excess of two hundred (200) Entitled Residential Units and up to four hundred (400) Entitled Residential Units, if any, plus (B) Forty-Five Thousand and No/100 Dollars ($45,000.00) for each Entitled Residential Unit approved to be built in excess of four hundred (400) Entitled Residential Units, if any. For the avoidance of doubt, Buyer shall not be required to make any Additional Payment pursuant to this Section 2.1.2 unless and until the number of Entitled Residential Units approved to be built exceeds two hundred (200) Entitled Residential Units. For purposes of clarity, in the event that six hundred (600) Entitled Residential Units are approved, then the Additional Payment shall be calculated as follows: (1) 600 total Entitled Residential Units minus the first 200 Entitled Residential Units equals 400 additional Entitled Residential Units; (2) the Entitled Residential Unit number exceeding 200 Entitled Residential Units and up to 400 Entitled Residential Units equals 200 Entitled Residential Units; (3) 200 Entitled Residential Units multiplied by $20,000.00 per Entitled Residential Unit equals $4,000,000.00; (4) the number of Entitled Residential Units exceeding 400 Entitled Residential Units and up to 600 Entitled Residential Units equals 200 additional Entitled Residential Units; (5) 200 Entitled Residential Units multiplied by $45,000.00 per Entitled Residential Unit equals $9,000,000.00; (6) $4,000,000.00 plus $9,000,000.00 equals a total Additional Payment with respect to Entitled Residential Units in this example of $13,000,000.00. A "**Residential Unit**" shall be a unit intended to be used primarily for residential purposes, and an "**Entitled Residential Unit**" shall

consist of a Residential Unit with respect to which Buyer has received all required approvals, and has the vested and unconditional right to build, which right shall not be subject to further appeal, including, without limitation, the resolution of any and all litigation with respect to such entitlements or the development of the Property by a final determination not subject to appeal or stay (such rights are referred to as "**Entitlements**").

(b)    Subject to Section 2.1.2 (c), if Commercial Units (as hereinafter defined) are to be constructed on the Property and Entitlements with respect to Entitled Commercial Units (as hereinafter defined) have been obtained, then the Additional Payment with respect to such Commercial Units shall be equal to (A) Twenty Thousand and No/100 Dollars ($20,000.00) for each seven hundred and fifty (750) square feet of income-producing commercial space within Entitled Commercial Units approved to be built above one hundred and fifty thousand (150,000) square feet up to three hundred thousand (300,000) square feet, if any, plus (B) Forty-Five Thousand and No/100 Dollars ($45,000.00) for each seven hundred and fifty (750) square feet of income-producing commercial space within Entitled Commercial Units approved to be built above three hundred thousand (300,000) square feet, if any. For the avoidance of doubt, Buyer shall not be required to make any Additional Payment pursuant to this Section 2.1.2 (b) unless and until the square footage of income-producing commercial space within Entitled Commercial Units approved to be built exceeds one hundred fifty thousand (150,000) square feet. For purposes of clarity, in the event that five hundred thousand (500,000) square feet of income-producing commercial space within Entitled Commercial Units are so approved, then the Additional Payment with respect to Entitled Commercial Units shall be calculated as follows:   (1) 500,000 square of income-producing commercial space within Entitled Commercial Units feet minus the first 150,000 square feet of income-producing commercial space within Entitled Commercial Units equals 350,000 additional square feet of income-producing space within Entitled Commercial Units; (2) the number of square feet of income-producing commercial space within Entitled Commercial Units exceeding 150,000 square feet of income-producing space within Entitled Commercial Units and up to 300,000 square feet of income-producing space within Entitled Commercial Units equals 150,000 square feet of income-producing space within Entitled Commercial Units; (3) 150,000 square feet of income-producing space within Entitled Commercial Units divided by 750 equals 200; (4) 200 multiplied by $20,000.00 equals $4,000,000.00; (4) the square footage over 300,000 square feet of income-producing space within Entitled Commercial Units and up to

500,000 square feet of income-producing space within Entitled Commercial Units equals an additional 200,000 square feet of income-producing space within Entitled Commercial Units; (5) 200,000 square feet of income-producing space within Entitled Commercial Units divided by 750 equals 266 2/3; (6) 266 2/3 multiplied by $45,000.00 equals $12,000,000.00; (7) $4,000,000.00 plus $12,000,000.00 equals a total Additional Payment with respect to Entitled Commercial Units in this example of $16,000,000.00. A "**Commercial Unit**" shall be a unit intended to be used primarily for commercial purposes, and an "**Entitled Commercial Unit**" shall consist of a Commercial Unit with respect to which Buyer has received all Entitlements for such use. For the avoidance of doubt, in the event that the Property shall include Residential Units and Commercial Units, Buyer shall be required to make an Additional Payment in accordance with Section 2.1.1 with respect to such Residential Units and this Section 2.1.2 (b) with respect to such Commercial Units.

(c)   Notwithstanding anything to the contrary set forth in Sections 2.1.2 (a) and (b) and 3.3, Buyer may elect in its sole and absolute discretion at any time to sell all (but not a portion) of the Property in whatever condition and state of entitlement Buyer desires prior to the "Entitlement Completion Date" (defined below), and the "Additional Payment", if any, in such event shall be equal to twenty-five percent (25%) of the excess of (a) the net cash proceeds from such sale (total proceeds minus any escrow fees for the closing, transfer or recording taxes, recording fees, brokerage commissions, credits provided to the purchaser, and any other amounts customarily charged to a seller in connection with the sale of real property located in Los Angeles, California), over (b) the Threshold Amount (as defined below); provided, however, that (i) Buyer shall not transfer the Property to a Buyer-controlled affiliate, or a director, officer, employee, or other insider of Buyer (each, a "**Buyer Party**") (and any such transfer shall be void *ab initio*) unless it has received the prior written consent of Seller to such transfer, which consent shall not be unreasonably withheld if Buyer provides Seller, no later than thirty (30) days prior to such transfer, written notice that such transfer will occur, together with (1) certified financial statements of the transferee that are reasonably acceptable to Seller, (2) evidence reasonably acceptable to Seller as to whether the terms of the transfer are arm's length terms and whether the purchase price being paid by the transferee represents the fair market value of the Property, and (3) if applicable, a copy of an assignment and assumption agreement between Buyer and the transferee which confirms that the transferee has assumed Buyer's obligation to make the Additional Payment and that Buyer is not released from its obligation to make such Additional

Payment, (ii) if in Seller's reasonable determination, a transfer to a Buyer Party is not on arm's length terms or the amount paid to Buyer by such Buyer Party does not represent the fair market value of the Property, then no Additional Payment shall be payable in connection with such transfer and the obligation of both Buyer and the transferee to make the Additional Payment shall survive the transfer of the Property, and (iii) if in Seller's reasonable determination, a transfer to a Buyer Party is on arm's length terms and the amount paid to Buyer by such Buyer Party represents the fair market value of the Property, then the Additional Payment shall be payable in connection with such transfer on the terms set forth above in this Section 2.1.2 (c) and the obligation of both Buyer and the transferee to make the Additional Payment under Sections 2.1.2 (a) and (b) shall terminate upon such payment; provided, however, that none of Buyer, its principals and/or its affiliates shall enter into any subsequent agreement concerning the Property for a period of three (3) years following such sale. The "**Threshold Amount**" shall be equal to the sum of (A) the Initial Payment, plus (B) accrued interest on the Initial Payment calculated at a rate of ten percent (10%) per annum, compounded quarterly from the Closing to the date of the applicable sale, plus (C) Buyer's out-of-pocket costs and expenses arising out of or related to the development process for the Property, including but not limited to costs and expenses for legal counsel, consultants, studies, and all litigation related to the development and entitlement of the Property, plus (D) accrued interest on the costs and expenses set forth in clause (C) above calculated at a rate of ten percent (10%) per annum, compounded quarterly from the date of incurrence to the date of the applicable sale.

      (d)    Survival.   The provisions of Section 2.1 shall survive Closing and recordation of the Deed.

     2.2    Lump Sum Payment Option.  Should Seller elect to have the Purchase Price paid in accordance with the terms of this Section 2.2 (the "**Lump Sum Payment Option**") then in such event, the purchase price for the Property (the "**Lump Sum Purchase Price**") shall consist of a single payment of Eighteen Million Six Hundred Thousand and 00/100 Dollars ($18,600,000.00) (the "**Lump Sum Payment**") at the time of Closing.

     2.3    Seller's Election of Payment Option.  Seller shall, at the time of the auction conducted under the Sale Procedures Order, and subject to the approval of the Bankruptcy Court, determine its election of which payment option it has chosen, either the Additional Payment Option or the Lump Sum Option. For the sake of clarity, if Seller elects the Additional Payment Option, then the provisions of Section 2.1, shall apply and Section 2.2 shall

be inapplicable.  By contrast, should Seller elect the Lump Sum Payment Option, then the provisions of Section 2.2 shall apply and Section 2.1 shall be inapplicable.

      3.     <u>Payment of Purchase Price</u>.  Buyer shall pay the Purchase Price to Seller as follows:

      3.1     <u>Deposit</u>.

      3.1.1     Within two (2) business days following the Effective Date, Buyer shall deposit the sum of Five Hundred Thousand and No/100 Dollars ($500,000.00) (together with the Deposit Advance and any interest earned thereon, the "**Initial Deposit**") into an escrow account with Wilshire Escrow Company through its offices located at 4270 Wilshire Blvd., Los Angeles, California  90010, Attention: Eric Shewfelt ("**Escrow Agent**") on terms and conditions acceptable to Buyer in Buyer's sole and absolute discretion (the "**Escrow**").  One Hundred and No/100 Dollars ($100.00) of the Initial Deposit (the "**Nonrefundable Deposit**") shall be fully earned by Seller and nonrefundable to Buyer upon receipt of the Initial Deposit by the Escrow Agent, as consideration for Seller entering into this Agreement.  No later than the first business day that follows the last day of the Feasibility Period, Buyer shall deposit the sum of Nine Million Five Hundred Thousand and No/100 Dollars ($9,500,000.00) (together with any interest earned thereon, the "**Additional Deposit**"; the Initial Deposit, but expressly excluding the Nonrefundable Deposit, and the Additional Deposit, collectively, the "**Deposit**") with Escrow Agent.  The Deposit shall be held by Escrow Agent as a deposit against the Purchase Price in accordance with the terms and provisions of this Agreement.  At all times that the Deposit is being held by the Escrow Agent, the Deposit shall be invested by Escrow Agent in an interest bearing account, earning interest at readily available, market rates, as directed or approved by Buyer.  The Escrow Agent shall only dispose of the Deposit as provided in this Agreement.  Subject to <u>Section 10.2</u>, in the event that the sale of the Property does not occur for any reason, then the entire amount of the Deposit, plus any and all interest earned on the Deposit, less the Liquidated Damages Amount authorized to be used by Seller pursuant to <u>Section 11.2</u>, shall be returned to Buyer.

      3.1.2     The following provisions shall control with respect to the rights, duties and liabilities of Escrow Agent.

      (a)     Escrow Agent acts hereunder as a depository only and is not responsible or liable in any manner whatsoever for the (i) sufficiency, correctness, genuineness or validity of any written instrument, notice or evidence of a party's

receipt of any instruction or notice which is received by Escrow Agent, or (ii) identity or authority of any person executing such instruction notice or evidence.

(b)     Escrow Agent shall have no responsibility hereunder except for the performance by it in good faith of the acts to be performed by it hereunder, and Escrow Agent shall have no liability except for its own willful misconduct or gross negligence.

(c)     Escrow Agent shall be reimbursed on an equal basis by Buyer and Seller for any reasonable expenses incurred by Escrow Agent arising from a dispute with respect to the amount held in escrow, including the cost of any legal expenses and court costs incurred by Escrow Agent, should Escrow Agent deem it necessary to retain an attorney with respect to the disposition of the amount held in escrow.

(d)     In the event of a dispute between the parties hereto with respect to the disposition of the amount held in escrow, Escrow Agent shall be entitled, at its own discretion, to deliver such amount to an appropriate court of law pending resolution of the dispute.

(e)     Escrow Agent shall invest the amount in escrow in accounts which are federally insured or which invest solely in government securities and shall be applied in accordance with the terms of this Agreement.  Interest earned thereon shall be added to the funds deposited by Buyer.

3.2     <u>Initial Payment or Lump Sum Payment</u>.  Either the Initial Payment or the Lump Sum Payment, as the case may be, based upon the payment option elected by Seller, which payment shall be adjusted by the application of the Deposit and by the prorations and credits specified herein, shall be paid to Escrow Agent by wire transfer of immediately available federal funds (through the escrow described in <u>Section 5</u>) on the Closing Date (the amount to be paid under this <u>Section 3.2</u> being herein called the "**Closing Payment**").

3.3     <u>Additional Payment</u>.  If, and only if, the Seller has elected the Additional Payment Option, subject to <u>Section 2.1.2 (c)</u>, the Additional Payment shall be due and payable upon the earlier of (i) if payable pursuant to <u>Section 2.1.2 (c)</u>, the date of closing of the applicable sale, and (ii) otherwise, thirty (30) days following the date that Buyer is granted all necessary Entitlements with respect to the Entitled Residential Units and/or the Entitled

Commercial Units, as applicable (the "**Entitlement Completion Date**"). Buyer shall use commercially reasonable efforts to maximize the number of such Entitled Residential Units and square feet of income-producing space within Entitled Commercial Units, as applicable. Buyer shall, within thirty (30) days following the Entitlement Completion Date, pay to Escrow Agent by wire transfer of immediately available federal funds (through the escrow described in Section 5) the Additional Payment. "**Entitlements**" shall mean all required approvals that give Buyer the vested and unconditional right to build Residential Units and/or Commercial Units, as applicable, which right shall not be subject to further appeal, including, without limitation, the resolution of any and all litigation with respect to such entitlements or the development of the Property by a final determination not subject to appeal or stay.

4.    Conditions Precedent. The obligation of Buyer to purchase, and Seller to sell, the Property as contemplated by this Agreement is subject to satisfaction of each of the following respective conditions precedent (any of which may be waived in writing by the party in whose favor such condition exists) on or before the applicable date specified for satisfaction of the applicable condition (or, if no date is specified, the Closing Date). If any of such conditions is not fulfilled (or so waived) pursuant to the terms of this Agreement, then the party in whose favor such condition exists may terminate this Agreement and, in connection with any such termination made in accordance with this Section 4, Seller and Buyer shall be released from further obligation or liability hereunder (except for those obligations and liabilities which, pursuant to the terms of this Agreement, expressly survive such termination), and the Deposit shall be disposed of in accordance with Section 10.

4.1    Title Matters.

4.1.1    Title Report. Buyer shall obtain within two (2) business days of the Effective Date a preliminary title report ("**Preliminary Title Report**") covering the Property prepared by Fidelity National Title Insurance Company (in its capacity as title company, the "**Title Company**"), and Seller has previously delivered to Buyer an existing survey of the Property. Buyer has ordered or shall order an update of such survey of the Property (the "**Survey**"). Buyer shall deliver to Seller a copy of each of the Preliminary Title Report and the Survey promptly following Buyer's receipt of each. If Buyer shall fail to deliver the "Buyer's Election Notice" (defined below) on or before the end of the Feasibility Period, then Buyer shall be deemed to have approved all exceptions to title shown on the Preliminary Title Report and the matters disclosed on the Survey and such matters shall be deemed to be Permitted Exceptions. If any exceptions to title or survey matters that were not Permitted Exceptions, were not described in the Preliminary Title Report, and were not revealed by the Survey are disclosed after the end

18

of the Feasibility Period, whether as a result of an update to the Preliminary Title Report, Survey, or otherwise, then Buyer shall provide Seller with notice of such exceptions to title or survey matters no later than five (5) days after Buyer obtains knowledge of the same. Seller may elect, in its sole discretion, to either cure some or all of such exceptions or matters or to decline to take any action with respect to some or all of any such exceptions or matters by providing written notice of such election to Buyer. If Seller declines to take any action with respect to some or all of any such exceptions or matters, then Buyer's sole remedy shall be to either (i) terminate this Agreement within five (5) days following its receipt of Seller's election notice, in which event this Agreement shall terminate, the Deposit shall be returned to Buyer, and the parties shall have no further rights or obligations under this Agreement except those that expressly survive termination of this Agreement, or (ii) waive such exceptions or matters and proceed to Closing in accordance with the terms of this Agreement. Notwithstanding the foregoing provisions of this Section 4.1.1, Seller shall be obligated to cause the release at Closing of or cause the Title Insurance Company to insure over at Closing any "**Seller Encumbrances**" (which, as used herein, means the lien securing any loan existing as of the date hereof and encumbering the Property, and any monetary liens, lis pendens and judgment liens which encumber the Land or the Improvements, but which expressly excludes any declarations, covenants, easements, or restrictions encumbering the Property, including the Reciprocal Use Agreements). Seller may elect to effectuate such release concurrent with the Closing using a portion of the Purchase Price.

   4.1.2 Title Contingency. A condition precedent to Buyer's obligation to purchase the Property shall be the irrevocable and unconditional commitment of Title Company, subject to Buyer's compliance with the terms of this Agreement, to issue to Buyer effective as of the date and time the Deed is recorded, an extended coverage ALTA owner's form title policy ("**Owner's Policy**"), or equivalent form acceptable to Buyer, with (subject to Buyer's payment of the fees and premiums for the issuance of such endorsements in accordance with Section 5.2) an endorsement eliminating arbitration provision and the Title Endorsements, with coverage in the amount of the Purchase Price (or such greater amount, up to the total anticipated cost of acquisition, development and construction of the Property, as Buyer may elect), and dated as of the date and time of recordation of the Deed, indicating title to the Land (including any easements described herein for the benefit of the Property) and Improvements to be vested of record in Buyer, subject solely to the "Permitted Exceptions" (as defined below). As used herein:

  "**Permitted Exceptions**" means the following: (1) the lien of any real estate taxes and assessments for the "Current Tax Year" (as defined below) and subsequent periods, to the extent

not yet payable, provided that the same are prorated in accordance with this Agreement; (2) such other matters and exceptions set forth in the Preliminary Title Report or Survey which are approved or deemed approved by Buyer during the Feasibility Period pursuant to the terms of this Agreement; (3) any matters and exceptions not set forth in the Survey or the Preliminary Title Report, but which are approved or deemed waived by Buyer pursuant to Section 4.1.1, and (4) that Reciprocal Use Agreement recorded as Instrument No. 01-1906087 in the Official Records of Los Angeles County, California, as alleged to be amended by that First Amendment to Reciprocal Use and Easement Agreement recorded as Instrument No. 20121064483 in the Official Records of Los Angeles County, California (collectively, the "**Reciprocal Use Agreements**").

"**Title Endorsements**" means the endorsements included in any title commitment or proforma or specimen policy issued by the Title Company and shall include, without limitation, the following endorsements, provided they are available in the State of California:  (a) access (CLTA 103.7 or local equivalent); and (b) separate tax parcel (CLTA 129.1, 129, or a local equivalent of either).

4.2    Feasibility Period.  Buyer shall have until 5:00 p.m. (Pacific Standard time) on April 3, 2015 or such earlier date as may be agreed upon by the parties (the period beginning on the date hereof and ending on such date being herein called the "**Feasibility Period**") within which to perform and complete all of Buyer's examinations, reviews and inspections of all matters pertaining to the Property, including, without limitation, all leases and service contracts, all physical, environmental and compliance matters and conditions respecting the Property (including, without limitation, all zoning and entitlement aspects of the Property), copies of Seller's insurance policies and copies of Seller's monthly operating reports filed with the Bankruptcy Court for the Property (together, the "**Property Documents**").  Seller has delivered to Buyer, or made available to Buyer at the Property, without representation or warranty or additional cost or expense to Seller, originals or copies of the Property Documents that are within Seller's possession or control.  Additionally, Seller shall provide Buyer with reasonable access to the Property and its files relating to the Property upon reasonable advance notice and shall use reasonable efforts (at no additional cost or expense to Seller) to promptly provide all other information reasonably requested by Buyer relating to the operation of the Property that is within Seller's possession or control.

4.2.1    Review Standards.  Buyer shall at all times conduct its reviews, inspections and examinations in a manner so as to not cause any greater than de minimis liability, damage, loss, cost or expense to Seller or the Property (other than that arising from the

discovery of preexisting conditions) and so as to not unreasonably interfere with or disturb any tenant at the Property, and Buyer will indemnify, defend, and hold Seller and the Property harmless from and against any such liability, damage, loss, cost or expense to the extent caused by Buyer's review, inspections or examinations of the Property (provided, however, that any such claim for damages shall exclude any or all indirect, consequential or punitive damages or lost profits of Seller) (the foregoing obligation surviving any termination of this Agreement), to the extent not arising from any preexisting condition, and specifically excluding any matters relating to the mere discovery of existing conditions. Buyer may (a) contact any tenant or service provider of the Property; (b) contact any governmental authority having jurisdiction over the Property; and (c) perform any structural or environmental testing of the Property; provided that without the prior written consent of Seller (which consent shall not be unreasonably withheld or delayed), in no event shall Buyer make any intrusive environmental or structural testing at the Property (such as soil borings, water samplings or the like) other than that which may be required in connection with the preparation of a Phase II environmental assessment of the Property (the "**Buyer Phase II**"). Seller hereby consents to Buyer conducting the Buyer Phase II; and Buyer hereby agrees to supply to Seller the report prepared for the Buyer's Phase II (the "**Phase II Report**") and any final reports produced in connection with any other invasive testing or asbestos testing, all within five (5) business days following Buyer's receipt thereof; provided, however, that if a final report has not been issued prior to the expiration of the Feasibility Period, Buyer will supply to Seller the most recent draft report in its possession within one (1) business day of the expiration of the Feasibility Period. The Phase II Report and any other reports produced in connection with foregoing shall be provided to Seller subject to the following conditions: (i) neither Seller nor any potential bidder may (y) rely on the information contained in such reports or (z) make a claim of reliance on such reports; (ii) every potential bidder must sign an agreement that includes a provision stating that it will not rely on any such reports and holds Buyer, Seller and the preparers of such reports harmless from any claims allegedly arising from such reliance before being allowed by Seller to access such reports; and (iii) the Sale Procedures Order shall expressly provide that no party can bid unless that party agrees that it is not relying on such reports and to release and waive any claims against Seller, Buyer and the preparer of such reports as a condition precedent to being allowed to submit a bid. Seller shall have the right, at its option, to cause a representative of Seller to be present at all inspections, reviews and examinations (including any tenant interviews) conducted hereunder. In the event of any termination hereunder (other than by reason of Seller's default), at Seller's written request, Buyer shall return or destroy all documents and other materials furnished by Seller hereunder. Promptly upon the completion of any physical inspection of the Property, Buyer shall at its sole cost and expense cause any portion of the Property damaged or altered by

or in connection with such inspection to be repaired and/or restored to substantially the condition it was in prior to the inspection. Any inspections undertaken by or on behalf of Buyer pursuant to this Section 4 shall be at Buyer's sole risk and the cost and expense of the inspections and tests undertaken pursuant to this Section 4 shall be borne solely by Buyer.

4.2.2    No Termination Right. While Buyer may continue to conduct its review, examination or inspection of the Property as provided for in this Section 4.2, the results of Buyer's review, examination or inspection of the Property shall not be a contingency to Buyer's obligation to acquire the Property, and such results shall not entitle Buyer to cancel this Agreement, it being expressly acknowledged that Buyer has satisfied itself as to the condition of the Property and all other matters pertaining to its feasibility inspections in a manner sufficient to allow Buyer to elect to proceed with closing of the transaction.

4.2.3    Conduct of Inspections. Buyer, at all times, will conduct all inspections and reviews in compliance with all Legal Requirements, and in a manner so as to not cause damage, loss, cost or expense to Seller or the Property. Other than required under the Legal Requirements, subpoena or other court order, Buyer shall not reveal to any governmental agency or any other third party (other than Buyer's employees, agents, attorneys, lenders and advisors) not approved by Seller the results of or any other information acquired pursuant to its inspections. "**Legal Requirement**" shall mean any applicable federal, state, local or municipal constitution, law, ordinance, rule, order, regulation or statute of any governmental authority bearing on the construction, alteration, rehabilitation, maintenance, use, operation, sale, transfer or any other aspect of all or any portion of the Property.

4.2.4    Confidentiality. Buyer covenants and agrees that, until the Closing Date, all information and materials disclosed and/or delivered to it by Seller, or Seller's agents, employees and representatives (including without limitation, the Property Documents), are confidential and proprietary information and shall not be disclosed except in accordance with Section 11.19 below. Buyer also agrees that, in the event the transactions contemplated in this Agreement are not consummated as provided herein, Buyer shall promptly return to Seller or notify Seller in writing that Buyer has destroyed all such information and documentation, and all copies thereof, together with copies of all third party reports and studies obtained by Buyer with respect to the Property that were not previously provided to Seller pursuant to Section 4.2.1 above, with any information confidential or proprietary to Buyer redacted.

4.2.5    No Representations or Warranties. Except as expressly provided herein, Seller makes no representations or warranties as to the truth, accuracy or completeness of

any materials, data or other information, if any, supplied to Buyer in connection with Buyer's inspection of the Property (e.g., that such materials are complete, accurate or the final version thereof, or that all such materials are in Seller's possession). Except for Buyer's reliance on any representation and warranties expressly provided herein, it is the parties' express understanding and agreement that any such materials are to be provided only for Buyer's convenience in making its own examination and determination as to whether it wishes to purchase the Property, and, in doing so, Buyer shall rely exclusively on its own independent investigation and evaluation of every aspect of the Property and not on any materials supplied by Seller. Except for Buyer's reliance on any representation and warranties expressly provided herein with respect to any such materials, Buyer expressly disclaims any intent to rely on any such materials provided to it by Seller in connection with its inspection and agrees that it shall rely solely on its own independently developed or verified information.

       4.2.6    <u>Survival</u>.    The obligations and agreements of Buyer under this <u>Section 4.2</u> (including its indemnification obligations) shall survive Closing or the termination of this Agreement.

       4.3    <u>Sale Order</u>.    As a condition precedent to Buyer's obligation to acquire the Property, the Bankruptcy Court shall have entered a sale order in substantially the form attached hereto as <u>Exhibit "K"</u> (the "**Sale Order**") and the Sale Order shall have become final and non-appealable, including that the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under Section 60(b) of the Federal Rules of Civil Procedure) or a petition for writ of certiorari with respect to the Sale Order must have expired and no such appeal, motion, or petition is pending.

       4.4    <u>Intentionally Deleted</u>.

       4.5    <u>Moratoria</u>.    As a condition precedent to Buyer's obligation to acquire the Property, there shall not exist any pending or effective Legal Requirements imposing development, building, or construction, moratoria that affect the Property.

       4.6    <u>Material Adverse Change</u>.    As a condition precedent to Buyer's obligation to acquire the Property, there shall not have been any adverse change in the physical condition of the Property from the Effective Date to the Closing Date which makes the Property materially more difficult to entitle and/or develop.

       4.7    <u>Governmental Authority Action</u>.    As a condition precedent to Buyer's obligation to acquire the Property, there shall be no governmental authority action of the type

described in Section 9.1.2I.

4.8     Occupancy.  As a condition precedent to Buyer's obligation to acquire the Property, there shall be no occupants of (or persons with occupancy rights in) the Property and the Property shall be delivered free and clear of any leases, contracts, easements or other agreements (if any), and any rights of any lessees under Bankruptcy Code section 365(h) with respect to any rejected leases, other than any Permitted Exceptions.

4.9     Service Agreements.  As a condition precedent to Buyer's obligation to acquire the Property, Seller shall terminate on the Closing Date all Service Agreements identified by Buyer pursuant to Section 8.2.

4.10    Performance by Seller.  The performance and observance, in all material respects, by Seller of all covenants and agreements of this Agreement to be performed or observed by Seller prior to or on the Closing Date shall be a condition precedent to Buyer's obligation to purchase the Property.  Without limitation on the foregoing, in the event that the "Seller Closing Certificate" (as hereinafter defined) shall disclose any material adverse changes in the representations and warranties of Seller contained in this Agreement or any certificate delivered by Seller in connection herewith which are not otherwise permitted or contemplated by the terms of this Agreement, then Buyer shall have the right to terminate this Agreement, in which case the Deposit shall be returned to Buyer.

4.11    Performance by Buyer.  The performance and observance, in all material respects, by Buyer of all covenants and agreements of this Agreement to be performed or observed by them prior to or on the Closing Date shall be a condition precedent to Seller's obligation to sell the Property.  Without limitation on the foregoing, in the event that the "Buyer Closing Certificate" (as hereinafter defined) shall disclose any material adverse changes in the representations and warranties of Buyer contained in this Agreement or any certificate delivered by Buyer in connection herewith which are not permitted or contemplated by the terms of this Agreement, then Seller shall have the right to terminate this Agreement and the Liquidated Damages Amount shall be delivered to Seller as liquidated damages.

4.12    Condition of the Property.  THE FOLLOWING PROVISIONS IN THIS SECTION 4.12 ARE SUBJECT TO THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 7 OF THIS AGREEMENT:

(a)     BY ENTERING INTO THIS AGREEMENT, BUYER HAS AGREED TO, AND WILL, PERFORM (AND BUYER REPRESENTS AND WARRANTS TO

24

SELLER THAT BUYER IS CAPABLE OF PERFORMING) AN INDEPENDENT INVESTIGATION, ANALYSIS AND EVALUATION OF THE PROPERTY.

(b)   BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS SUBSTANTIAL EXPERIENCE WITH REAL PROPERTY, AND THAT BUYER WILL ACQUIRE THE PROPERTY IN "AS IS, WHERE IS, WITH ALL FAULTS" CONDITION, AND SOLELY IN RELIANCE ON BUYER'S OWN INSPECTION AND EXAMINATION AND SELLER'S REPRESENTATIONS AND WARRANTIES EXPRESSLY CONTAINED HEREIN.

I     EXCEPT AS TO THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT SELLER MAKES NO REPRESENTATIONS, WARRANTIES OR GUARANTIES OF ANY KIND, NATURE OR SORT, EXPRESS OR IMPLIED, WITH RESPECT TO THE PHYSICAL CONDITION, PAST, PRESENT OR FUTURE OPERATION AND/OR PERFORMANCE, OR VALUE, OF THE PROPERTY AND THAT SELLER CONVEYS THE PROPERTY TO BUYER "AS IS AND WHERE IS, WITH ALL FAULTS," AND BUYER ACKNOWLEDGES THAT SELLER MAKES NO REPRESENTATIONS, GUARANTIES OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, AS TO THE QUALITY, CHARACTER, EXTENT, PERFORMANCE, CONDITION OR SUITABILITY OF THE PROPERTY FOR ANY PURPOSE.

(d)   BUYER'S INSPECTION, INVESTIGATION AND SURVEY OF THE PROPERTY SHALL BE IN LIEU OF ANY NOTICE OR DISCLOSURE REQUIRED BY ANY APPLICABLE HEALTH AND SAFETY CODE, OR BY ANY OTHER PROVISION OF APPLICABLE LAW, RULE OR REGULATION, INCLUDING, WITHOUT LIMITATION, LAWS REQUIRING DISCLOSURE BY SELLER OF FLOOD, FIRE, MOLD, SEISMIC HAZARDS, LEAD PAINT, LANDSLIDE AND LIQUEFACTION, OTHER GEOLOGICAL HAZARDS, RAILROAD AND OTHER UTILITY ACCESS, SOIL CONDITIONS AND OTHER CONDITIONS WHICH MAY AFFECT THE USE OF THE PROPERTY, AND BUYER HEREBY WAIVES ANY REQUIREMENT FOR A NOTICE PURSUANT TO THOSE PROVISIONS AND HEREBY ACKNOWLEDGES AND AGREES THAT IT WILL CONDUCT ITS OWN INSPECTIONS AND REVIEWS WITH RESPECT TO ALL MATTERS COVERED THEREBY, AND HEREBY RELEASES SELLER FROM LIABILITY IN CONNECTION WITH ANY SUCH MATTERS THAT ARE NOT THE SUBJECT OF

SELLER'S REPRESENTATIONS AND WARRANTIES.

I     BUYER   ALSO   ACKNOWLEDGES   AND   AGREES   THAT, ALTHOUGH   SELLER   HAS   PROVIDED   TO   BUYER   THE   PROPERTY DOCUMENTS AND OTHER DOCUMENTS AND RECORDS, SELLER HAS NOT VERIFIED THE ACCURACY THEREOF AND MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING THE MATTERS SET FORTH THEREIN EXCEPT AS MAY BE EXPRESSLY SET FORTH HEREIN, IT BEING THE RESPONSIBILITY OF BUYER TO VERIFY THE ACCURACY OF SUCH MATERIALS.

(f)     FURTHERMORE, EXCEPT AS TO THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER ACKNOWLEDGES THAT SELLER HAS NOT AND DOES NOT MAKE ANY REPRESENTATIONS   OR   WARRANTIES   IN   CONNECTION   WITH   THE PRESENCE OR INTEGRATION OF HAZARDOUS MATERIALS UPON OR WITHIN THE PROPERTY.  IN THAT REGARD, BUYER WILL, PRIOR TO THE EXPIRATION   OF   THE   DUE   DILIGENCE   PERIOD,   CONDUCT   ITS   OWN INVESTIGATIONS TO DETERMINE IF THE PROPERTY CONTAINS ANY HAZARDOUS MATERIALS OR TOXIC WASTE, MATERIALS, DISCHARGE, DUMPING OR CONTAMINATION, WHETHER SOIL, GROUNDWATER OR OTHERWISE, WHICH VIOLATES ANY FEDERAL, STATE, LOCAL OR OTHER GOVERNMENTAL LAW, REGULATION OR ORDER OR REQUIRES REPORTING TO ANY GOVERNMENTAL AUTHORITY.

(g)     EXCEPT AS TO THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER, FOR ITSELF AND ITS OWNERS, SUCCESSORS AND ASSIGNS, HEREBY RELEASES AND FOREVER DISCHARGES SELLER, AND ITS PAST, PRESENT AND FUTURE MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AGENTS, ATTORNEYS, ASSIGNS, AND SUCCESSORS-IN-INTEREST FROM ALL PAST, PRESENT AND FUTURE CLAIMS, DEMANDS, OBLIGATIONS, LOSSES AND CAUSES OF ACTION OF ANY NATURE WHATSOEVER, WHETHER NOW KNOWN OR UNKNOWN, DIRECT OR INDIRECT, FORESEEN OR UNFORESEEN, SUSPECTED OR UNSUSPECTED, WHICH ARE BASED UPON OR ARISE OUT OF OR IN CONNECTION WITH THE CONDITION OF THE PROPERTY AND, WITH RESPECT TO THE PRESENCE OF ANY HAZARDOUS MATERIALS, ANY ENVIRONMENTAL   DAMAGES   OR   ENVIRONMENTAL   REQUIREMENTS,

INCLUDING, WITHOUT LIMITATION, THE PHYSICAL, STRUCTURAL, GEOLOGICAL, MECHANICAL AND ENVIRONMENTAL (SURFACE AND SUBSURFACE) CONDITION OF THE PROPERTY OR ANY LAW OR REGULATION RELATING TO HAZARDOUS MATERIALS. WITHOUT LIMITING THE FOREGOING, THIS RELEASE SPECIFICALLY APPLIES TO ALL LOSSES AND CLAIMS ARISING UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED, THE SUPERFUND AMENDMENTS AND REAUTHORIZATION ACT OF 1986, (42 U.S.C. SECTIONS 9601 ET SEQ.), THE RESOURCES CONSERVATION AND RECOVERY ACT OF 1976, (42 U.S.C. SECTIONS 6901 ET SEQ.), THE CLEAN WATER ACT, (33 U.S.C. SECTIONS 466 ET SEQ.), THE SAFE DRINKING WATER ACT, (14 U.S.C. SECTION 1401-1450), THE HAZARDOUS MATERIALS TRANSPORTATION ACT, (49 U.S.C. SECTIONS 1801 ET SEQ.), THE TOXIC SUBSTANCE CONTROL ACT, (15 U.S.C. SECTIONS 2601-2629), AND ANY OTHER FEDERAL, STATE OR LOCAL LAW OF SIMILAR EFFECT, AS WELL AS ANY AND ALL COMMON LAW CLAIMS.

(h)     BUYER FURTHER ACKNOWLEDGES AND AGREES THAT (I) IT HAS HAD AN OPPORTUNITY TO REVIEW THE RECIPROCAL USE AGREEMENTS, (II) IT HAS HAD A FULL OPPORTUNITY TO DISCUSS THE RECIPROCAL USE AGREEMENTS WITH ITS COUNSEL, AND (III) THE PURCHASE PRICE REFLECTS THE VALUATION OF THE PROPERTY AS ENCUMBERED BY THE RECIPROCAL USE AGREEMENTS.

BY INITIALING THIS CLAUSE BELOW, BUYER ACKNOWLEDGES THAT THIS SECTION HAS BEEN READ AND FULLY UNDERSTOOD, AND THAT BUYER HAS HAD THE CHANCE TO ASK QUESTIONS OF ITS COUNSEL ABOUT ITS MEANING AND SIGNIFICANCE.

BUYER'S INITIALS

(i)     "Environmental Damages" means all claims, judgments, damages, losses, penalties, fines, liabilities (including strict liability), encumbrances, liens, costs, and expenses of investigation and defense of any claim, whether or not such claim is ultimately defeated, and of any good faith settlement of judgment, of whatever kind or

nature, contingent or otherwise matured or unmatured, foreseeable or unforeseeable, including without limitation reasonable attorneys' fees and disbursements and consultants' fees, any of which are incurred at any time as a result of the existence of Hazardous Materials upon, about or beneath the Property or migrating to or from the Property, or the existence of a violation of Environmental Requirements pertaining to the Property, regardless of whether the existence of such Hazardous Materials or the violation of Environmental Requirements arose prior to the present ownership or operation of the Property.

(j)     **"Environmental Requirements"** means all applicable present and future statutes, regulations, rules, ordinances, codes, licenses, permits, orders, approvals, plans, authorizations, concessions, franchises, and similar items, of all governmental agencies, departments, commissions, boards, bureaus, or instrumentalities of the United States, states and political subdivisions thereof and all applicable judicial, administrative, and regulatory decrees, judgments, and orders relating to Hazardous Materials or the protection of human health or the environment.

(k)     **"Hazardous Materials"** means any substance (i) the presence of which requires investigation or remediation under any federal, state or local statute, regulation, ordinance or policy; or (ii) which is defined as a **"hazardous waste"** or **"hazardous substance"** under any federal, state or local statute, regulation or ordinance, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601 et seq.) and the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.) and amendments thereto and regulations promulgated thereunder; or (iii) which is toxic, explosive, corrosive, infectious or otherwise hazardous or is regulated by any federal, state or local governmental authority; or (iv) without limitation which contains polychlorinated biphenyls (PCBs), asbestos or urea formaldehyde.

The provisions of this Section 4.12 shall survive Closing.

5.     Closing Procedure.     The sale and purchase herein provided shall be consummated (the **"Closing"**) at a closing conference, which shall be held on the Closing Date held through Escrow. The Closing shall take place no later than five (5) business days (or such other date as mutually agreed by Buyer and Seller) following the satisfaction or waiver of all conditions to Closing set forth in Section 4; provided, however, if the Sale Order provides for the option to close at a later date than the date that is five (5) business days following the

satisfaction or waiver of all conditions to Closing set forth in <u>Section 4</u>, the Closing shall take place at such later date as Buyer shall approve in its sole good faith discretion (the "**Closing Date**") including:

5.1     <u>Escrow</u>. Except as otherwise specifically indicated herein, at least one (1) business day prior to the Closing Date, Seller and Buyer shall deliver to Escrow Agent the items set forth in <u>Section 5.1.1</u> and <u>Section 5.1.2</u>. Such delivery shall be made pursuant to separate escrow instructions ("**Escrow Instructions**") to be delivered by each of Buyer and Seller to Escrow Agent. The conditions to the closing of such escrow shall include the Escrow Agent's receipt of the Closing Payment and a notice from each of Buyer and Seller authorizing Escrow Agent to close the transactions as contemplated herein (each of Buyer and Seller being obligated to deliver such authorization notice on the Closing Date as soon as it is reasonably satisfied that the other party is in a position to deliver the items to be delivered by such other party herein).

5.1.1     <u>Seller Deliveries</u>.  At least one (1) business day prior to the Closing Date, Seller shall deliver to Buyer through Escrow the following:

(a)     One (1) original of a duly executed and acknowledged original grant deed (the "**Deed**") in the form of <u>Exhibit "C"</u>;

(b)     Two (2) originals of a duly executed bill of sale and ("**Bill of Sale**") from Seller with respect to the Personal Property and Intangible Property included in the Property in the form of <u>Exhibit "D"</u>;

(c)     Two (2) originals of a duly executed certificate of Seller (the "**Seller Closing Certificate**") in the form of <u>Exhibit "E"</u> representing to Buyer that the representations and warranties of Seller contained in this Agreement are true and correct as of the Closing Date in all material respects;

(d)     An affidavit pursuant to Section 1445(b)(2) of the Code, and on which Buyer is entitled to rely, that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code. If Seller fails to provide such form on or before the Closing Date, Seller agrees that the Escrow Agent shall be authorized and instructed to withhold the amount required by the Foreign Investment in Real Property Tax Act at Closing from that portion of the Purchase Price that would otherwise be disbursed to Seller and to disburse that amount to the Internal Revenue Service in accordance with that act;

(e)    Evidence reasonably satisfactory to Title Company respecting the due organization of Seller and the due authorization and execution of this Agreement and the documents required to be delivered hereunder;

(f)    To the extent they are then in Seller's possession or control, and have not heretofore been delivered to Buyer:  (i) any plans and specifications for all Improvements on the Property; (ii) all unexpired warranties and guarantees which Seller has received in connection with any work or services performed with respect to, or equipment installed in, the improvements on the Property; (iii) all keys for all improvements on the Property; (iv) all material, non-privileged documents of Seller relating to the Property, (v) originals of all Leases, all material correspondence to or from any tenants and all other files or materials relating to the Leases; and (vi) originals of all Service Agreements that will remain in effect after the Closing and all correspondence and records relating to the on-going operations (including tenant billings) and maintenance of the Property (which materials under this clause (f) may be either delivered at Closing or left at the management office at the Property);

(g)    One (1) certified copy of the Sale Order; and

(h)    Such additional documents as may be reasonably required by Buyer and Title Company in order to consummate the transactions hereunder (provided the same do not increase in any material respect the costs to, or liability or obligations of, Seller in a manner not otherwise provided for herein).

5.1.2    Buyer Deliveries.  At least one (1) day prior to the Closing Date, unless otherwise indicated, Buyer shall deliver to Seller through Escrow the following:

(a)    On the Closing Date, the Closing Payment, by wire transfer in immediately available federal funds;

(b)    Two (2) counterpart originals of a duly executed and acknowledged Bill of Sale;

(c)    Two (2) originals of a certificate of Buyer (the "**Buyer Closing Certificate**") in the form of Exhibit "F" representing to Seller that the representations and warranties of Buyer contained in this Agreement are true and correct as of the Closing Date;

(d)     Evidence reasonably satisfactory to Title Company respecting the due organization of Buyer and the due authorization and execution of this Agreement and the documents required to be delivered hereunder;

(e)     Such additional documents as may be reasonably required by Seller and Title Company in or to consummate the transactions hereunder (provided the same do not increase in any material respect the costs to, or liability or obligations of, Buyer in a manner not otherwise provided for herein).

5.2     <u>Closing Costs</u>.  Seller shall pay (i) 100% of all state, county and city transfer taxes and fees payable, if any, in connection with the transfer contemplated herein, (ii) 100% of all excise and sales taxes, (iii) 100% of all recording charges for the Deed and the Bill of Sale, to the extent recorded, (iv) 100% of any lien payment or debt prepayment penalties in connection with the release of any Seller Encumbrances, (v) 100% of Seller's legal fees, (vi) the title insurance premium for the CLTA portion of the Owner's Policy, (vii) any fees or compensation due CBRE, Inc. ("**Broker**"), and (viii) 50% of all escrow charges.  Buyer shall pay (i) 100% of its own review costs and third party property inspection fees, including the cost of any additional environmental, asbestos and physical audits Buyer deems necessary, (ii) 100% of Buyer's legal fees, (iii) 50% of all escrow charges, (iv) the costs of ALTA extended coverage and any endorsements to the Owner's Policy and (v) 100% of the costs of the Survey.  Any other closing costs shall be allocated in accordance with local custom.  Seller and Buyer shall pay their respective shares of prorations as hereinafter provided.

5.3     <u>Prorations</u>.

5.3.1    <u>Items to be Prorated</u>.  Subject to <u>Section 5.3.2</u> below, the following shall be prorated between Seller and Buyer as of 11:59 p.m. Pacific Standard Time on the day prior to the Closing Date (on the basis of the actual number of days elapsed over the applicable period).  Except as expressly provided to the contrary in this <u>Section 5.3</u>, all items of revenue, cost and expense of the Property, with respect to the period prior to 11:59 p.m. on the day prior to the Closing Date, shall be for the account of Seller and all items of revenue, cost and expense of the Property, with respect to the period after 11:59 p.m. on the day prior to the Closing Date, shall be for the account of Buyer.

(a)     All real estate taxes and assessments on the Property and any and all personal property and excise taxes for the tax year (the "**Current Tax Year**") in which the Closing occurs.  Seller shall be responsible for all real property taxes,

31

personal property taxes, regardless of when payable and when billed, impositions and other assessments that are attributable to the period prior to the Closing Date, and Buyer shall be responsible for all real property taxes, personal property taxes, regardless of when payable and when billed, impositions and other assessments that are attributable to the period from and after the Closing Date.  If the real property tax rate, personal property tax rate or any assessment has not been set for the fiscal year in which the Closing occurs, then the proration of such real property tax, personal property tax or assessment shall be based upon the rate or assessment for the preceding fiscal year for such tax or assessment which has not been set for the fiscal year in which the Closing occurs, and such proration shall be adjusted between Seller and Buyer upon presentation of written evidence that the actual taxes or assessment paid (determined as of the date such taxes or assessment are actually paid) for the fiscal year in which the Closing occurs differ from the amounts used at Closing and in accordance with the provisions of Section 5.3.3.

(b)      All fixed and additional rentals under the Leases, security deposits and other tenant charges.  Seller shall leave with Buyer, or provide a credit in an amount equal to, all prepaid rentals for periods after the Closing Date and all refundable security deposits (to the extent the foregoing were made by tenants under the Leases and are not applied or forfeited prior to the Closing Date) to Buyer on the Closing Date. Rents that are delinquent (or payable but unpaid) as of the Closing Date shall not be prorated on the Closing Date.  Until the date that is twelve (12) months after the Closing, Buyer shall include such delinquencies (or unpaid amounts) in its normal billing and diligently pursue the collection thereof in good faith after the Closing Date (but Buyer shall not be required to litigate or declare a default under any Lease).  Commencing on the date which is six (6) months after the Closing Date, Seller may also diligently pursue delinquencies in rent attributable to the period prior to Closing, and to the extent such delinquencies are collected by Seller, Seller shall be entitled to retain amounts collected and inform Buyer of same in writing, provided however, that Seller shall not be entitled to, and shall not, terminate any Lease or any tenant's right of possession.  Except as otherwise provided in this Section 5.3.1(b), to the extent Buyer receives rents on or after the Closing Date and on or before the date that is 12 months after the Closing (the "**Delinquent Rent Period**"), such payments shall be applied first toward the rent for the then-current month and any post-closing delinquent rent, then the rent for the month in which the Closing occurs, and any excess monies received shall be applied toward the payment of any pre-closing delinquent rent owed to Seller under the applicable Lease, with Seller's share thereof (in any case) being promptly delivered to Seller, and with any

remaining balance being delivered to, or held by, Buyer, as applicable. Buyer shall not waive any delinquent (or unpaid) rents or modify a Lease so as to reduce or otherwise affect amounts owed thereunder for any period with respect to which Seller is entitled to receive a share of charges or amounts without first obtaining Seller's written consent. However, with respect to delinquent rents and any other amounts or other rights of any kind respecting tenants who are no longer tenants of the Property as of the Closing Date, Seller shall retain all rights relating thereto. Notwithstanding anything set forth above, the Seller shall reject and shall not assign to Buyer all contracts and leases (including, without limitation, the Ground Lease) relating to the Property, other than leases or contracts, if any, identified as being assumed and assigned on Exhibit "B".

(c)      All fees due under any Service Agreements that are not being terminated as of the Closing Date.

5.3.2   Items Not Prorated. Seller shall take use commercially reasonable efforts to cause meters for utilities at the Property, including telephone, electricity, water and gas, to be read on the Closing Date, and Buyer shall be responsible for all actions needed to arrange for utilities to be transferred to the name of Buyer on the Closing Date, including the posting of any required deposits. In the event a meter reading is unavailable for any particular utility, such utility shall be prorated in the manner provided in Section 5.3.3 below.

5.3.3   Calculation. The prorations and payments shall be made on the basis of a written statement submitted to Buyer and Seller by Escrow Agent prior to the Close of Escrow and approved by Buyer and Seller. Any item which cannot be finally prorated because of the unavailability of information shall be tentatively prorated on the basis of the best data then available and reprorated when the information is available. In the event any prorations or apportionments made under this Section 5.3.3 shall prove to be incorrect for any reason, then any party shall be entitled to an adjustment to correct the same provided a written request identifying the error in reasonable detail is given to the other party no later than 12 months after the Closing.

6.      Condemnation or Destruction of Property. In the event that, after the date hereof but prior to the Closing Date, either any portion of the Property is taken pursuant to eminent domain proceedings or any of the Improvements on the Property are damaged or destroyed by any casualty, Seller shall not have any obligation to repair or replace any such damage or destruction, but Seller shall be required to give Buyer prompt written notice of the same. Seller shall deliver and assign to Buyer, upon consummation of the transaction herein provided (except to the extent any condemnation proceeds or insurance proceeds are attributable to lost rents or

other items applicable to any period prior to the Closing), all claims of Seller respecting any condemnation or casualty insurance coverage, as applicable, and all condemnation proceeds or proceeds from any such casualty insurance received by Seller on account of any casualty (except to the extent required for costs of repairs by Seller prior to the Closing Date), as applicable. In connection with any assignment of insurance proceeds hereunder, Buyer shall be credited with an amount equal to the applicable deductible amount under Seller's insurance, and the amount of any uninsured damage (except to the extent required for costs of repairs by Seller prior to the Closing Date). In the event the condemnation award or the cost of repair of damage to the Property on account of a casualty, as applicable, shall exceed Two Hundred Fifty Thousand and No/Dollars ($250,000.00), materially and adversely affect access to the Property, or prevent Buyer from obtaining permits to construct at least 200 Entitled Residential Units or at least 150,000 square feet of Commercial Units, Buyer may, at its option, terminate this Agreement by notice to Seller, given on or before the Closing Date, whereupon Buyer shall receive a refund of the Deposit.

7.    Representations and Warranties.

7.1    Representations and Warranties of Seller.  Seller hereby represents and warrants to Buyer as of the Effective Date and as of the Closing Date the following, to Seller's knowledge:

7.1.1    Leases.  There are no leases of space in the Property or licenses to use space in the Property that will be in force on the Closing Date and under which Seller is the landlord or the licensor (whether by entering into the leases or licenses or acquiring the Property subject to the leases or licenses) other than those certain antenna leases more particularly described at Exhibit "G" (the "Leases"). None of the Leases have been amended, except as set forth in Exhibit "G". There are no security deposits under the Leases, except as set forth in Exhibit "G". All of the Leases are in full force and effect, neither Seller nor any tenant is in monetary default or material non-monetary default under any of the Leases, except as set forth on Exhibit "G", and no tenant under any Lease has filed for bankruptcy. All of the Leases are terminable at will by the Seller upon thirty (30) days' notice or may be rejected by Seller in the Chapter 11 Case. That certain Ground Lease and Right of First Refusal, dated April 25, 2000, by and between Debtor and De Young Kim and Hyon K. Kim, recorded as Instrument No. 00-0639451 in the Official Records of Los Angeles County, California (the "**Ground Lease**") has been terminated and is no longer of any force or effect.

7.1.2    Litigation.  Except as otherwise described in Exhibit "H", there is

no pending (and Seller has not received any written notice of any threatened) action, litigation, condemnation or other proceeding (collectively, **"Proceeding"**) involving any portion of the Property or against Seller and Seller is not aware of any Proceeding involving any portion of the Property that has previously been settled or otherwise concluded. Seller has no knowledge of any proposed or pending zone changes, contemplated condemnation or existing or contemplated assessment affecting any portion of the Property.

7.1.3   Compliance. Seller has received no written notice from any governmental authority having jurisdiction over the Property or any insurance carrier of Seller to the effect that the Property is not in compliance with any applicable codes, laws, statutes, ordinances, regulations, rules, covenants, conditions or restrictions.

7.1.4   Agreements and Contracts. Except as otherwise described in Exhibit "I", there are no service agreements, equipment leasing contracts or other contracts or agreements relating to the Property (including, without limitation, contracts or agreements which may affect the ownership, management, maintenance, operation, development, construction or financing of the Property) currently in effect or which will be in force after the Closing, except for the Leases, the Service Agreements and the Permitted Encumbrances. As used herein, the **"Service Agreements"** means, collectively, (i) contracts described in Exhibit "I", and (ii) contracts entered into in accordance with this Agreement. Neither Seller nor any party to the Service Agreements is in monetary default or material non-monetary default under the Service Agreements. The leases described in Exhibit "H" are the only agreements in force and effect relating to the occupancy of the Property.

7.1.5   Due Authority. This Agreement and all agreements, instruments and documents herein provided to be executed or to be caused to be executed by Seller is and on the Closing Date will be duly authorized, executed and delivered by and are binding upon Seller. Richard J. Laski is the duly appointed Chapter 11 Trustee of the Holy Hill Community Church bankruptcy estate pending as bankruptcy case no. 2:14-bk-21070-WB in the United States Bankruptcy Court, Central District of California, Los Angeles Division. Seller has the capacity and authority to enter into this Agreement and consummate the transactions herein provided without the consent or joinder of any other party.

7.1.6   Consents; No Conflict. Other than the Sale Procedures Order and the Sale Order, Seller has obtained all consents and permissions related to the transactions herein contemplated and required under any covenant, agreement, encumbrance, or applicable laws. Neither this Agreement nor any agreement or certificate executed by Seller under Section 5.1.1,

nor anything provided in or contemplated by this Agreement or any such other agreement or certificate, does now or shall hereafter breach, violate, invalidate, cancel, make inoperative or interfere with, or result in the acceleration or maturity of, any agreement, document, instrument, right or interest, judgment, order, injunction, decree, law, regulation or ruling of any court or other governmental authority affecting or relating to Seller or the Property.

       7.1.7  Environmental Matters.   Except as set forth in the reports described in Exhibit "J" (the "**Environmental Reports**"), there is (and has been) no Hazardous Materials at, upon or adjacent to the Property.

       7.1.8  Designation of Easements.   There exist no unrecorded agreements that obligate Seller or any of its successors in title or any other party to grant an easement or any other right of way to any party for any designated areas at the Property.

       7.1.9  ERISA.   Neither (i) any assets of Seller, nor (ii) any funds to be used by Seller with respect to the transactions contemplated pursuant to this Agreement, are, or at Closing will be, pursuant to ERISA or the Code considered for any purpose of ERISA or Section 4975 of the Code to be assets of a Plan.  Seller is not executing this Agreement and will not be performing its obligations or exercising its rights or remedies under the Agreement on behalf of or for the benefit of any Plan.  Neither the execution or delivery of this Agreement by Seller, nor the performance by Seller of its obligations or the exercise of its rights or remedies under this Agreement, nor any transaction contemplated under this Agreement, is or will be a "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code.  For the purposes hereof the following terms shall have the following meanings:  "**Code**" shall mean the Internal Revenue Code of 1986, as amended; "**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended (and any successor statute and any applicable regulations or guidance promulgated thereunder); and "**Plan**" shall mean a "plan" as that term is defined in Section 3(3) of ERISA or Section 4975 of the Code.

       7.1.10  OFAC.   Seller is not a "foreign person" or "foreign corporation" as those terms are defined in the Internal Revenue Code of 1986 and the regulations promulgated thereunder.  Neither Seller nor any of its affiliates, is (A) conducting any business or engaging in any transaction or dealing with any person appearing on the U.S. Treasury Department's OFAC list of prohibited countries, territories, "specifically designated nationals" or "blocked person" (each a "Prohibited Person") (which lists can be accessed at the following web address: http://www.ustreas.gov/offices/enforcement/ofac/), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (B)

engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (C) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (D) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or I engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (1) any U.S. anti-money laundering law, (2) the Foreign Corrupt Practices Act, (3) the U.S. mail and wire fraud statutes, (4) the Travel Act, (5) any similar or successor statutes or (6) any regulations promulgated under the foregoing statutes.

   7.1.11  <u>Intentionally Deleted</u>.

   7.1.12  <u>Property Documents</u>.  Prior to the Effective Date, Seller delivered or otherwise made available to Buyer all Property Documents that are within Seller's possession or control at no additional cost or expense to Seller.  To Seller's knowledge, the Property Documents, taken as a whole and when considered in the context of Buyer's overall due diligence review, are not materially false or misleading.

   7.2 <u>Representations and Warranties of Buyer</u>.  Buyer hereby represents and warrants to Seller the following:

   7.2.1 <u>Due Authority</u>.  This Agreement and all agreements, instruments and documents herein provided to be executed or to be caused to be executed by Buyer are and on the Closing Date will be duly authorized, executed and delivered by and are binding upon Buyer.  Buyer is a limited liability company, duly organized and validly existing and in good standing under the laws of the State of California, and Buyer is duly authorized and qualified to do all things required of it under this Agreement.  Buyer has the capacity and authority to enter into this Agreement and consummate the transactions herein provided without the consent or joinder of any other party (except as otherwise may be set forth in this Agreement).

   7.2.2 <u>Consents; No Conflict</u>.  Other than the Sale Procedures Order and the Sale Order, Buyer has obtained all consents and permissions related to the transactions herein contemplated and required under any covenant, agreement, encumbrance, or applicable laws. Neither this Agreement nor any agreement or certificate executed by Buyer under Section 5.1.2,

nor anything provided in or contemplated by this Agreement or any such other agreement or certificate, does now or, to Buyer's knowledge, shall hereafter breach, violate, invalidate, cancel, make inoperative or interfere with, or result in the acceleration or maturity of, any agreement, document, instrument, right or interest, judgment, order, injunction, decree, law, regulation or ruling of any court or other governmental authority affecting or relating to Buyer.

7.2.3   OFAC.   Buyer is not a "foreign person" or "foreign corporation" as those terms are defined in the Internal Revenue Code of 1986 and the regulations promulgated thereunder.  Neither Buyer nor any of its affiliates, is (A) conducting any business or engaging in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (B) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (C) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (D) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or I engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (1) any U.S. anti-money laundering law, (2) the Foreign Corrupt Practices Act, (3) the U.S. mail and wire fraud statutes, (4) the Travel Act, (5) any similar or successor statutes or (6) any regulations promulgated under the foregoing statutes.

7.3   No Survival.   It is the intention of the parties that the representations and warranties set forth in this Section 7 shall not survive Closing and shall merge into the Deed.

7.4   Knowledge.   When a statement is made under this Agreement to the "knowledge" of Seller (or other similar phrase), it means only the present actual knowledge of Richard J. Laski, without any duty of inquiry, any imputation of the knowledge of another, or independent investigation of the relevant matter by any individual(s), and without any personal liability.  Notwithstanding any provision of this Agreement to the contrary, should any of the foregoing representations and warranties of Seller become false or inaccurate prior to the Closing Date through no breach by Seller of its covenants hereunder, and provided Seller discloses the same to Buyer, in writing, prior to the Closing Date, then Buyer's sole recourse shall be to either (i) terminate this Agreement and cancel the Escrow, in which case the Deposit shall be returned to Buyer and neither Seller nor Buyer will have any further liability or obligation under this

Agreement (except for those obligations which survive in accordance with their terms), or (ii) proceed with the Closing, without reservation, in which case Buyer shall be deemed to have waived all claims against Seller with respect to such false or inaccurate representation and warranty.

8.    Interim Covenants.    Until the Closing Date or the sooner termination of this Agreement:

8.1    Maintenance and Operation.    Seller shall maintain the Property in the same manner as prior hereto (such maintenance obligations not including capital expenditures or expenditures not currently being incurred in Seller's ordinary maintenance of the Property), subject to reasonable wear and tear and further subject to destruction by casualty or other events beyond the reasonable control of Seller.    Without limitation of the foregoing, Seller shall maintain its current or comparable insurance.

8.2    Service Agreements.    From the Effective Date until the expiration of the Feasibility Period, Seller shall not enter into any additional service contracts or other similar agreements relating to the Property or material modifications to the Service Agreements without the prior written consent of Buyer, which consent will not be unreasonably withheld.    Following the expiration of the Feasibility Period, Seller shall not enter into any additional service contracts or other similar agreements relating to the Property or material modifications to the Service Agreements without the prior written consent of Buyer, which may be granted or withheld in Buyer's sole and absolute discretion.    Seller shall terminate on the Closing Date any Service Agreements identified by Buyer in a written notice from Buyer to Seller during the Feasibility Period stating Buyer's intention to have such Service Agreements terminated.

8.3    Leases.    From the Effective Date until the expiration of the Feasibility Period, Seller shall not terminate, modify, extend, renew, amend, replace or otherwise change any of the Leases or existing contracts or enter into new leases or contracts without the prior written consent of Buyer, which consent will not be unreasonably withheld.    Following the expiration of the Feasibility Period, provided that this Agreement has not been terminated, Seller shall not enter into any new leases or material modifications of existing Leases or such new leases without Buyer's prior written consent, which may be granted or withheld in Buyer's sole and absolute discretion.

8.4    Access to the Property.    Seller shall give Buyer access to the Property in accordance with and subject to the provisions of Section 4.2.

8.5    Mortgages.  Seller shall not encumber the Property with any mortgages or deeds of trust or other encumbrances other than those that encumber the Property as of the Effective Date.

8.6    Bankruptcy Court Filings and Approval.

8.6.1    Pursuant to Section 9.1.1, Seller shall file with the Bankruptcy Court: (i) a motion seeking approval of the Sale Procedures Order within three (3) business days after the parties hereto have executed this Agreement and the Buyer has reasonably approved in writing the form of such motion, and (ii) a motion seeking approval for the Sale Order, after written approval by Buyer of the form of such motion, so that the motion is granted and the Sale Order is entered on or prior to June 1, 2015.

8.6.2    Seller shall use all reasonable efforts to cause the Bankruptcy Court to enter (i) the Sale Procedures Order on or prior to April 27, 2015 and (ii) the Sale Order on or prior to May 31, 2015, which Sale Order shall approve a sale to the successful bidder at any auction conducted under the Sale Procedures Order or to Buyer if there are no other qualified bidders.

8.6.3    Buyer agrees that it will use commercially reasonable efforts to promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Procedures Order and the Sale Order and a finding by the Bankruptcy Court of adequate assurance of future performance by Buyer under each executory contract to be assumed and assigned to Buyer.

8.6.4    If Seller desires to materially revise the draft of the motion to approve the Sale Procedures Order and/or the motion to approve the Sale Order, prior to the filing of such motion, Seller shall (i) provide a copy thereof (including the related forms of order and notice and supporting materials) to Buyer and its counsel, (ii) provide Buyer and its counsel a reasonable opportunity to review and comment on such document and any supplement thereto and (iii) incorporate any reasonable comments of Buyer and its counsel into such document and any amendment or supplement thereto.  Notwithstanding the foregoing, within three (3) business days after the parties hereto have executed this Agreement, the Seller shall file such amendments, supplements or modifications to the Sale Procedures Order and/or proposed Sale Order as may be necessary to incorporate the terms of this Agreement and the fact that Buyer has exercised its rights under the ROFR and that the Original Agreement has been terminated in accordance with the same.  In addition to the incorporation of all other provisions of this

Agreement, the Seller shall also amend, supplement or modify the Sale Procedures Order to provide that any and all Qualified Bidders must waive any and all right to assert a substantial contribution claim in connection with the sale of the Property or the Chapter 11 Case. The Buyer shall have the right to reasonably approve such amendments, supplements or modifications prior to their filing by Seller.

       8.6.5    Seller and Buyer acknowledge that this Agreement and the sale of the Property are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest, best or otherwise financially superior offer possible for the Property.

       8.6.6    Seller shall give appropriate notice, and provide appropriate opportunity for hearing, to all persons entitled thereto, of all motions, orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.

       8.6.7    In the event an appeal is taken or a stay pending appeal is requested from the Sale Procedures Order or Sale Order, Seller shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay.  Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from or stay request in respect of either of such orders.  Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal or stay request and obtain an expedited resolution of such appeal.

       8.6.8    After entry of the Sale Order, to the extent Buyer is the successful bidder at the Auction, Seller shall not take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

     8.7     <u>Break-Up Fee; Expense Reimbursement Amount</u>.

       8.7.1    If this Agreement is terminated after the Effective Date pursuant to Section 9.1.1 and Buyer is not in material breach of this Agreement at the time of such termination, then Seller shall pay in cash to Buyer a break-up fee in the amount of Three Hundred Thousand and No/100 Dollars ($300,000.00) (the "**Break-Up Fee**") by wire transfer of immediately available funds to the account specified by Buyer to Seller in writing within five (5)

business days following closing of the Alternative Transaction. The Break Up Fee shall be deemed to expressly include all of Buyer's out-of-pocket costs, fees and expenses incurred by Buyer and its Affiliates in connection with this Agreement and the transactions contemplated hereby, which amounts shall not be independently recoverable by Buyer, except as otherwise authorized pursuant to Section 11.18 below. For the avoidance of doubt, if this Agreement is terminated after the Effective Date pursuant to Section 9.1.1 and Buyer is not in material breach of this Agreement at the time of such termination, the Deposit (less any Deposit Advance) shall also be returned to Buyer.

8.7.2    If this Agreement is terminated after the Effective Date pursuant to Section 9.1.2 and Buyer is not in material breach of this Agreement at the time of such termination, the Deposit shall be returned to Buyer.

8.7.3    The obligations of Seller to pay the Break-Up Fee as provided in this Agreement shall be entitled to superpriority administrative expense status pursuant to Sections 364(c)(1), 503(b) and 507(a)(2) of the Bankruptcy Code, senior to all other administrative expenses claims, in the Bankruptcy Case.

8.7.4    Seller agrees and acknowledges that Buyer's due diligence, efforts, negotiation and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal and other resources by Buyer and its Affiliates and that such due diligence, efforts, negotiation and execution have provided value to Seller. The provision of the Break-Up Fee is an integral part of this Agreement, without which Buyer would not have entered into this Agreement. Seller's obligation to pay the Break-Up Fee shall survive the termination of this Agreement.

8.7.5    If this Agreement is terminated pursuant to Section 9.1.1 or Section 9.1.2, Seller shall file for the Sale Order to be amended in order to provide for the payment of the Break-Up Fee, in accordance with this Section 8.

9.    Termination.

9.1    Termination Events.    Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date:

9.1.1    By Buyer if:

(a)     Buyer is not the winning bidder at the sale contemplated by the Sale Procedures Order;

(b)     Seller enters into or consummates a transaction other than that contemplated by this Agreement (an "**Alternative Transaction**");

(c)     a motion seeking approval for the Sale Procedures Order is not filed by Seller within three (3) business days after the parties hereto have executed this Agreement and the Buyer has approved in writing the form of motion seeking approval of the Sale Procedures Order;

(d)     the Sale Procedures Order is not entered on or prior to April 27, 2015;

(e)     a motion seeking approval for the Sale Order, after written approval by Buyer of the form of such motion, is not granted and the Sale Order is not entered on or prior to June 1, 2015;

(f)     The Chapter 11 Case is dismissed or converted into a Chapter 7 bankruptcy case; or

(g)     Seller breaches any of its representations, warranties or covenants set forth in this Agreement in any material respect or fails to effectuate the Closing when required under this Agreement.

9.1.2   By either Seller or Buyer if:

(a)     the Closing does not occur on or prior to June 19, 2015, other than as a result of a material breach by the terminating party, as applicable, of any covenant or agreement contained herein;

(b)     any of the conditions to Closing shall have become incapable of fulfillment other than as a result of a breach by Buyer (if Buyer is the party electing to terminate) or Seller (if Seller is the party electing to terminate), as applicable, of any covenant or agreement contained herein; or

(c)     there shall be in effect a final order of a governmental authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the Closing.

10.   <u>DISPOSITION OF DEPOSIT</u>.

10.1   IF THE TRANSACTION HEREIN PROVIDED SHALL NOT BE CLOSED BY REASON OF SELLER'S DEFAULT UNDER THIS AGREEMENT OR THE FAILURE OF SATISFACTION OF THE CONDITIONS BENEFITING BUYER UNDER <u>SECTION 4</u> OR THE TERMINATION OF THIS AGREEMENT IN ACCORDANCE WITH <u>SECTION 6</u>, THEN THE DEPOSIT SHALL BE RETURNED TO BUYER, AND NO PARTY SHALL HAVE ANY FURTHER OBLIGATION OR LIABILITY TO THE OTHER (EXCEPT UNDER THOSE PROVISIONS OF THIS AGREEMENT THAT EXPRESSLY SURVIVE TERMINATION OF THIS AGREEMENT); PROVIDED, HOWEVER, IF THE TRANSACTION HEREUNDER SHALL FAIL TO CLOSE SOLELY DUE TO THE DEFAULT OF SELLER, THEN BUYER, AS ITS SOLE AND EXECLUSIVE REMEDY, SHALL BE ENTITLED TO (1) SPECIFICALLY ENFORCE THIS AGREEMENT (BUT ONLY UPON THE ENTRY OF THE SALE ORDER) OR (2) TERMINATE THIS AGREEMENT AND OBTAIN A RETURN OF THE DEPOSIT, LESS THE LIQUIDATED DAMAGES AMOUNT AUTHORIZED TO BE USED BY SELLER PURSUANT TO <u>SECTION 11.2</u>, BUT NO OTHER ACTION, FOR DAMAGES OR OTHERWISE, SHALL BE PERMITTED (EXCEPT THAT, IF SPECIFIC PERFORMANCE IS NOT AVAILABLE DUE TO A DEFAULT BY SELLER HEREUNDER AFTER ENTRY OF THE SALE ORDER, BUYER SHALL BE ENTITLED TO PURSUE A CLAIM FOR DAMAGES (NOT TO EXCEED THREE MILLION AND NO/100 DOLLARS ($3,000,000.00))).

10.2   IN THE EVENT THE TRANSACTION HEREIN PROVIDED SHALL NOT CLOSE SOLELY DUE TO THE DEFAULT OF BUYER, BUT IF AND ONLY IF THE SALE ORDER IS ENTERED BY THE BANKRUPTCY COURT, THEN THREE MILLION AND NO/100 DOLLARS ($3,000,000.00) OF THE DEPOSIT (THE "LIQUIDATED DAMAGES AMOUNT") SHALL BE DELIVERED TO SELLER AS FULL COMPENSATION AND LIQUIDATED DAMAGES UNDER AND IN CONNECTION WITH THIS AGREEMENT, AND IN SUCH EVENT, BUYER SHALL NOT BE LIABLE TO SELLER FOR MONETARY DAMAGES EXCEPT FOR FORFEITURE OF THE LIQUIDATED DAMAGES AMOUNT (AND AS PROVIDED UNDER THOSE PROVISIONS OF THIS AGREEMENT THAT EXPRESSLY SURVIVE TERMINATION OF THIS AGREEMENT).  THE AMOUNT OF THE DEPOSIT IN EXCESS OF THE LIQUIDATED DAMAGES AMOUNT SHALL BE RETURNED TO BUYER.  IN CONNECTION WITH THE FOREGOING, THE PARTIES RECOGNIZE

44

THAT SELLER WILL INCUR EXPENSES IN CONNECTION WITH THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT AND THAT THE PROPERTY WILL BE REMOVED FROM THE MARKET; FURTHER, THAT IT IS EXTREMELY DIFFICULT AND IMPRACTICABLE TO ASCERTAIN THE EXTENT OF DETRIMENT TO SELLER CAUSED BY THE BREACH BY BUYER UNDER THIS AGREEMENT AND THE FAILURE OF THE CONSUMMATION OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT OR THE AMOUNT OF COMPENSATION SELLER SHOULD RECEIVE AS A RESULT OF BUYER'S BREACH OR DEFAULT. IN THE EVENT THE SALE CONTEMPLATED HEREBY SHALL NOT BE CONSUMMATED ON ACCOUNT OF BUYER'S DEFAULT, THEN THE RETENTION OF THE LIQUIDATED DAMAGES AMOUNT SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY UNDER THIS AGREEMENT BY REASON OF SUCH DEFAULT, SUBJECT TO THE PROVISIONS OF THIS AGREEMENT THAT EXPRESSLY SURVIVE A TERMINATION OF THIS AGREEMENT AND THE PARTIES SHALL TAKE SUCH ACTION AS MAY BE REQUIRED TO CAUSE THE ESCROW DEPOSIT TO BE DELIVERED TO SELLER.

| _____ | _____ |
|---|---|
| Seller's Initials | Buyer's Initials |

    10.3   IN THE EVENT THE TRANSACTION HEREIN PROVIDED SHALL CLOSE, THE DEPOSIT SHALL BE APPLIED AS A PARTIAL PAYMENT OF THE PURCHASE PRICE.

    11.   Miscellaneous.

    11.1   Termination of Original Agreement; Rights of Associates Buyer; . Seller shall undertake any and all steps and execute such documents as may be necessary to effectuate the termination of the Original Agreement. Notwithstanding the foregoing, the parties acknowledge that Associates Buyer shall upon termination of the Original Agreement, be entitled to: (i) a return of its Deposit and Deposit Advance (as such terms are defined in the Original Agreement), plus any interest accrued thereon as provided for in the Original Agreement; and (ii) its Expense Reimbursement (as defined in the Original Agreement), payable to Associates Buyer in accordance with the terms of the Original Agreement. The parties expressly acknowledge and confirm that Associates Buyer shall not be entitled to any Break Up

THAT SELLER WILL INCUR EXPENSES IN CONNECTION WITH THE
TRANSACTION CONTEMPLATED BY THIS AGREEMENT AND THAT THE
PROPERTY WILL BE REMOVED FROM THE MARKET; FURTHER, THAT IT IS
EXTREMELY DIFFICULT AND IMPRACTICABLE TO ASCERTAIN THE EXTENT
OF DETRIMENT TO SELLER CAUSED BY THE BREACH BY BUYER UNDER THIS
AGREEMENT AND THE FAILURE OF THE CONSUMMATION OF THE
TRANSACTION CONTEMPLATED BY THIS AGREEMENT OR THE AMOUNT OF
COMPENSATION SELLER SHOULD RECEIVE AS A RESULT OF BUYER'S
BREACH OR DEFAULT. IN THE EVENT THE SALE CONTEMPLATED HEREBY
SHALL NOT BE CONSUMMATED ON ACCOUNT OF BUYER'S DEFAULT, THEN
THE RETENTION OF THE LIQUIDATED DAMAGES AMOUNT SHALL BE
SELLER'S SOLE AND EXCLUSIVE REMEDY UNDER THIS AGREEMENT BY
REASON OF SUCH DEFAULT, SUBJECT TO THE PROVISIONS OF THIS
AGREEMENT THAT EXPRESSLY SURVIVE A TERMINATION OF THIS
AGREEMENT AND THE PARTIES SHALL TAKE SUCH ACTION AS MAY BE
REQUIRED TO CAUSE THE ESCROW DEPOSIT TO BE DELIVERED TO SELLER.



_____          _____
Seller's Initials                        Buyer's Initials

10.3   IN THE EVENT THE TRANSACTION HEREIN PROVIDED
SHALL CLOSE, THE DEPOSIT SHALL BE APPLIED AS A PARTIAL PAYMENT OF
THE PURCHASE PRICE.

11.   Miscellaneous.

11.1   Termination of Original Agreement; Rights of Associates Buyer;   Seller
shall undertake any and all steps and execute such documents as may be necessary to effectuate
the termination of the Original Agreement. Notwithstanding the foregoing, the parties
acknowledge that Associates Buyer shall upon termination of the Original Agreement, be
entitled to: (i) a return of its Deposit and Deposit Advance (as such terms are defined in the
Original Agreement), plus any interest accrued thereon as provided for in the Original
Agreement; and (ii) its Expense Reimbursement (as defined in the Original Agreement), payable
to Associates Buyer in accordance with the terms of the Original Agreement. The parties
expressly acknowledge and confirm that Associates Buyer shall not be entitled to any Break Up

Fee under this Agreement or the Original Agreement and the Sale Procedures Order shall be amended, supplemented or modified to reflect the same.

    11.2 <u>Superpriority Loan</u>. Upon opening of Escrow, Seller may, in its sole discretion, use up to Five Hundred Thousand and 00/100 Dollars ($500,000.00) of the Deposit (the "**Maintenance Advance Amount**"), or any portion thereof, for the maintenance of the Property, and Escrow Agent is hereby authorized to release any such requested portion of the Maintenance Advance Amount to Seller for such purposes. If Buyer is not the successful buyer of the Property, the portion of the Maintenance Advance Amount used for the maintenance of the Property, if deemed refundable pursuant to this Agreement, shall be returned to Buyer from the deposit of the successful bidder, plus interest at eight percent (8%) per annum (calculated from the date of the Deposit), on the date that Seller enters into an agreement with the successful bidder. In the event the Property is not sold to any party pursuant to an asset sale under Section 363 of the Bankruptcy Code, Buyer shall be entitled to a super-priority administrative claim under the Bankruptcy Code against the bankruptcy estate of Seller for any used portion of the Maintenance Advance Amount, which super-priority administrative claim may include interest at eight percent (8%) per annum. Seller shall grant Buyer a security interest in the Property to secure Seller's payment obligations to Buyer in this <u>Section 11.2</u>.

    11.3 <u>Financing</u>. Buyer is not dependent on any third party financing for the Purchase Price.

    11.4 <u>Brokers</u>.

    11.4.1 Except as provided in <u>Section 11.4.2</u> below, Seller represents and warrants to Buyer, and Buyer represents and warrants to Seller, that no broker or finder has been engaged by it, in connection with the sale contemplated by this Agreement. In the event of a claim for broker's or finder's fee or commissions in connection with the sale contemplated by this Agreement, then Seller shall indemnify, defend and hold harmless Buyer from the same if it shall be based upon any statement or agreement alleged to have been made by Seller, and Buyer shall indemnify, defend and hold harmless Seller from the same if it shall be based upon any statement or agreement alleged to have been made by Buyer. The indemnification obligations under this <u>Section 11.4.1</u> shall survive the Closing of the transactions hereunder or the earlier termination of this Agreement.

    11.4.2 If and only if the sale contemplated herein closes, Seller has agreed to pay a brokerage commission to Seller's Broker pursuant to a separate agreement between

Seller and Seller's Broker, which Seller shall be exclusively responsible for and shall indemnify, defend and hold harmless Buyer from the same.

      11.5   Survival. Except as otherwise expressly provided herein, none of the warranties, representations, covenants, obligations, agreements and indemnifications contained in this Agreement shall survive the Closing and shall be merged with the Deed. By proceeding with the closing of the sale transaction, Seller and Buyer shall be deemed to have waived, and so covenant to waive, any claims of defaults or breaches by the other party existing on or as of the Closing Date whether under this Agreement or any other document or instrument executed by the other party in connection with this transaction, of which the waiving party was made aware by notice from the defaulting or breaching party (and, if applicable, which is described on Seller's certification of representations and warranties to be delivered at Closing) prior to the Closing Date for which the other party shall have no liability.

      11.6   Further Instruments. Each party will, whenever and as often as it shall be requested so to do by the other, cause to be executed, acknowledged or delivered any and all such further instruments and documents as may be necessary or proper, in the reasonable opinion of the requesting party, in order to carry out the intent and purpose of this Agreement.

      11.7   Cumulative Remedies. Except as otherwise set forth herein, no remedy conferred upon a party in this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute (except as otherwise expressly herein provided).

      11.8   No Waiver. No waiver by a party of any breach of this Agreement or of any warranty or representation hereunder by the other party shall be deemed to be a waiver of any other breach by such other party (whether preceding or succeeding and whether or not of the same or similar nature), and no acceptance of payment or performance by a party after any breach by the other party shall be deemed to be a waiver of any breach of this Agreement or of any representation or warranty hereunder by such other party, whether or not the first party knows of such breach at the time it accepts such payment or performance. No failure or delay by a party to exercise any right it may have by reason of the default of the other party shall operate as a waiver of default or modification of this Agreement or shall prevent the exercise of any right by the first party while the other party continues to be so in default.

      11.9   Consents and Approvals. Except as otherwise expressly provided herein,

any approval or consent provided to be given by a party hereunder must be in writing to be effective and may be given or withheld in the absolute discretion of such party.

       11.10   <u>Press Releases</u>.  Any press release issued with respect to the transactions contemplated by this Agreement shall be subject to the prior approval of Buyer and Seller, which consent shall not be unreasonably withheld.

       11.11   <u>Modification</u>.  This Agreement may not be modified or amended except by written agreement signed by all parties.

       11.12   <u>Matters of Construction</u>.

       11.12.1 <u>Incorporation of Exhibits</u>.  All exhibits attached and referred to in this Agreement are hereby incorporated herein as fully set forth in (and shall be deemed to be a part of) this Agreement.

       11.12.2 <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties respecting the matters herein set forth and supersedes all prior agreements between the parties hereto respecting such matters.  Seller and Buyer each expressly disclaim any reliance on any oral or written representations, warranties, comments, statements or assurances made by Seller, Buyer, and any of their respective affiliates, and their respective agents, employees, representatives, attorneys or brokers, as an inducement or otherwise, to Buyer's and Seller's respective execution hereof.

       11.12.3 <u>Non-Business Days</u>.  Whenever action must be taken (including the giving of notice or the delivery of documents) under this Agreement during a certain period of time (or by a particular date) that ends (or occurs) on a non-business day, then such period (or date) shall be extended until the immediately following business day.  As used herein, "business day" means any day other than a Saturday, Sunday or federal or California state holiday.

       11.12.4 <u>Severability</u>.  If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

       11.12.5 <u>Interpretation</u>.  Words used in the singular shall include the plural,

and vice-versa, and any gender shall be deemed to include the other. Whenever the words "including", "include" or "includes" are used in this Agreement, they shall be interpreted in a non-exclusive manner. The captions and headings of the Sections of this Agreement are for convenience of reference only, and shall not be deemed to define or limit the provisions hereof. Except as otherwise indicated, all Exhibit and Section references in this Agreement shall be deemed to refer to the Exhibits and Sections in this Agreement. Each party acknowledges and agrees that this Agreement (a) has been reviewed by it and its counsel, (b) is the product of negotiations between the parties, and (c) shall not be deemed prepared or drafted by any one party. In the event of any dispute between the parties concerning this Agreement, the parties agree that any ambiguity in the language of the Agreement is to not to be resolved against Seller or Buyer, but shall be given a reasonable interpretation in accordance with the plain meaning of the terms of this Agreement and the intent of the parties as manifested hereby.

11.12.6 Governing Law. This Agreement is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of California shall govern (without regard to conflicts of law). The Bankruptcy Court shall retain exclusive jurisdiction to enforce the provisions of this Agreement.

11.12.7 Third Party Beneficiaries. Except as otherwise expressly provided in this Agreement, Seller and Buyer do not intend by any provision of this Agreement to confer any right, remedy or benefit upon any third party, and no third party shall be entitled to enforce or otherwise shall acquire any right, remedy or benefit by reason of any provision of this Agreement.

11.13   No Recordation. In no event shall this Agreement or any document or memorandum related to the subject matter of this Agreement be recorded without the prior written consent of Seller and except as herein provided.

11.14   Effectiveness of Agreement. In no event shall any draft of this Agreement create any obligations or liabilities, it being intended that only a fully executed and delivered copy of this Agreement will bind the parties hereto.

11.15   No Joint Venture. This Agreement does not and shall not be construed to create a partnership, joint venture or any other relationship between the parties hereto except the relationship of the seller and buyer specifically established hereby.

11.16   Successors and Assigns. Buyer may assign this Agreement (in whole or in

part) and any document executed in connection herewith and its rights and obligations hereunder to a new entity or multiple new entities by delivery of written notice of such assignment to Seller, provided that such assignee(s) expressly assume(s) the obligations of Buyer. Upon any such assignment by Buyer and acceptance by such assignee(s) of all rights and obligations under this Agreement and such other document(s), Buyer shall be relieved from liability under this Agreement and such other document(s).

11.17   Notices. Any notice which a party is required or may desire to give the other party shall be in writing and may be delivered (1) personally, (2) by United States registered or certified mail, postage prepaid, (3) by Federal Express or other reputable courier service regularly providing evidence of delivery (with charges paid by the party sending the notice); or (4) by facsimile, provided that such facsimile shall be immediately followed by delivery of such notice pursuant to clause (1), (2) or (3) above. Any such notice shall be addressed as follows (subject to the right of a party to designate a different address for itself by notice similarly given):

> To Buyer:
> 1111 Sunset, LLC
> 1855 East Industrial Street, Suite 106
> Los Angeles, CA 90021
> Attention:     Yuval Bar-Zemer
> Telephone:    (213) 622-2731
> Fax:          (213) 622-2151
>
> With Copy To:
>
> The Ault Firm, Inc.
> 12730 High Bluff Dr., Suite 290
> San Diego, California 92130
> Attention:     Timothy R. Ault, Esq.
> Telephone:    (858)792-7506
> Fax:          (858) 792-9016
>
> To Seller:
>
> Holy Hill Community Church
> 470 Maylin Street

Pasadena, California 91105
Attention:     Richard J. Laski, Chapter 11 Trustee
Telephone:   (716) 868-8483
Fax:             (626) 584-1814

With Copy To:

Arent Fox LLP
Gas Company Tower
555 West Fifth Street, 48th Floor
Los Angeles, California 90013
Attention:     Aram Ordubegian
Telephone:   (213) 629-7410
Fax:             (213) 629-7401

To Title Company:

Fidelity National Title Insurance Company
915 Wilshire Blvd., Suite 1920
Los Angeles, CA 90017
Attention:     Connie Mahoney/JB Jennings
Telephone:   (213) 452-7112

Any notice so given by mail shall be deemed to have been given as of the date of delivery (whether accepted or refused) established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case may be. Any such notice not so given shall be deemed given upon actual receipt of the same by the party to whom the same is to be given. Notices given by facsimile transmission and shall be deemed given upon the actual receipt of the same by the individual to which they are addressed. The attorneys for any party hereto shall be entitled to provide any notice that a party desires to give or is required to give hereunder.

      11.18   Legal Costs. The parties hereto agree that they shall pay directly any and all legal costs, which they have incurred on their own behalf in the preparation of this Agreement, all other agreements pertaining to this transaction, and that such legal costs shall not be part of the closing costs. In addition, if any party hereto brings any suit or other proceeding with respect to the subject matter or the enforcement of this Agreement, the prevailing party (as determined by the court, agency or other authority before which such suit or proceeding is

52

commenced), in addition to such other relief as may be awarded, shall be entitled to recover reasonable attorneys' fees, expenses and costs of investigation actually incurred from the non-prevailing party. The foregoing includes attorneys' fees, expenses and costs of investigation (including those incurred in appellate proceedings), costs incurred in establishing the right to indemnification, or in any action or participation in, or in connection with, any case or proceeding under Chapter 7, 11 or 13 of the Bankruptcy Code (11 United States Code Sections 101 et seq.), or any successor statutes. This Section shall survive any termination of this Agreement.

      11.19 <u>Confidentiality</u>. Prior to the entry of the Sale Order, the terms of the transfers contemplated in this Agreement, including the Purchase Price and all other financial terms, as well as the information delivered by Seller or discovered by Buyer and its agents in connection with its investigation of the Property shall remain confidential and shall not be disclosed by either party hereto without the written consent of the other except (1) to such party's directors, officers, partners, members, employees, legal counsel, accountants, prospective lenders, engineers, architects, financial advisors and similar professionals and consultants to the extent such party deems it necessary or appropriate in connection with the transaction contemplated hereunder (and such party shall inform each of the foregoing parties of such party's obligations under this Paragraph, provided however, that such parties shall have no liability on account of any failure by any such representatives and agents to keep such information confidential); (2) as otherwise required by law or regulation; or (3) to the extent data becomes available to such parties from any other source (other than by reason of a breach by such party of the confidentiality restrictions herein). Notwithstanding the foregoing, Seller and Buyer each acknowledge and agree that the form of this Agreement shall be attached to the Sale Procedures Order, a copy of this Agreement will be delivered to any overbidders at the auction conducted under the Sale Procedures Order, and that copies of notices, documents, reports, and other information regarding the Property will be delivered to potential bidders in connection with the auction conducted under the Sale Procedures Order. Each party shall indemnify, defend and hold the other party harmless from and against any Claims arising from a breach by it of this <u>Section 11.19</u>. The restrictions in this Paragraph shall survive a termination of this Agreement but shall terminate as to Buyer only upon the purchase of the Property by Buyer.

      11.20 <u>Time of the Essence</u>. Time is of the essence as to this Agreement and each and every obligation hereunder.

      11.21 <u>Exclusivity</u>. Except as set forth in <u>Section 11.1</u>, Seller shall not solicit, negotiate, or make any offer or enter into any letter of intent, contract or other agreement for the

sale, purchase, or refinancing of the Property or Seller's interest (e.g., partnership interest) therein unless and until this Agreement is terminated in accordance with its terms.

11.22   Limitation of Liability.

11.22.1No present or future direct or indirect partner, member, manager, director, officer, shareholder, employee, advisor, affiliate or agent of Buyer or any affiliate of such parties shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Seller, on its behalf and on behalf of its successors and assigns, shall look solely to the Buyer for the payment of any claim or for any performance, and Seller hereby waives any and all such personal liability.  For purposes of this Section 11.22, no negative capital account or any contribution or payment obligation of any partner or member in Buyer shall constitute an asset of Buyer.  The limitations of liability contained herein are in addition to, and not in limitation of, any limitation on liability applicable to Buyer provided elsewhere in this Agreement or by law or by any other contract, agreement or instrument.

11.22.2Any provision providing that it survives the Closing will survive Closing without limitation unless a specified period is otherwise provided in this Agreement.  All other representations, warranties, covenants and agreements made or undertaken by Seller under this Agreement, unless otherwise specifically provided herein, will not survive the Closing Date but will be merged into the Deed and other Closing documents delivered at the Closing.

11.23   Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

11.24   IRS – Form 1099-S.  For purposes of complying with Section 6045 of the Internal Revenue Code of 1986, as amended, Escrow Agent shall be deemed the "person responsible for closing the transaction" and shall be responsible for obtaining the information necessary to file with the Internal Revenue Service Form 1099-S, "Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions."

11.25   Waiver Regarding California Property.   Buyer specifically waives the provisions of California Code Section 1542, which provides as follows:

A  GENERAL  RELEASE  DOES  NOT  EXTEND  TO  CLAIMS  WHICH  THE

CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN TO HIM MUST HAVE MATERIALLY AFFECTED THE SETTLEMENT WITH THE DEBTOR.

Buyer agrees, represents and warrants that the aforementioned waiver of California Code Section 1542 has been negotiated and agreed upon and that Buyer hereby intends to release, discharge and acquit Seller from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses with respect to the Property; provided, however, that the foregoing shall not relieve Seller of any disclosures required pursuant to this Section or any express representations or warranties or covenants set forth in this Agreement.

11.26 **WAIVER OF JURY TRIAL**.   THE PARTIES HEREBY IRREVOCABLY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT.   THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.   IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

[REMAINDER OF PAGE INTENTIONALLY BLANK; SIGNATURES PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date
first above written.

SELLER:

RICHARD J. LASKI, CHAPTER 11 TRUSTEE
FOR HOLY HILL COMMUNITY CHURCH

By: _____

Name: RICHARD J. LASKI

Title: TRUSTEE


BUYER:

1111 SUNSET, LLC,
a California limited liability company

By: _____

Name: Yuval Bar-Zemer

Title: Manager


[Signature Page to Purchase and Sale Agreement]

56

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:

RICHARD J. LASKI, CHAPTER 11 TRUSTEE
FOR HOLY HILL COMMUNITY CHURCH

By: _____
     Name:
     Title:


BUYER:

1111 SUNSET, LLC,
a California limited liability company

By: _____
     Name: Yuval Bar-Zemer
     Title: Manager

[Signature Page to Purchase and Sale Agreement]

## JOINDER OF BROKER

The undersigned broker ("**Broker**") executes this joinder ("**Joinder**") to the Purchase and Sale Agreement to which it is attached (the "**Purchase Agreement**"), solely for the purpose of evidencing its agreement to the provisions of this Joinder. Unless otherwise defined in this Joinder, all terms used in a capitalized manner in this Joinder shall have the meaning set forth in the Purchase Agreement. Broker understands and agrees that Buyer, and its respective partners, shareholders, members, and affiliates, and the partners, members, officers, directors, employees, shareholders, advisors, trustees, beneficiaries, and agents of all of the foregoing (collectively, the "**Buyer Parties**") and Seller will be relying on this Joinder in connection with the transactions contemplated by the Purchase Agreement (the "**Acquisition**"). With such understanding and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Broker hereby represents, warrants, confirms and agrees, on behalf of itself and its successors and assigns, for the benefit of the Buyer Parties and their respective successors and assigns, that:

1.      If and only if the Acquisition closes in accordance with the Purchase Agreement, Broker will be entitled to payment of one percent (1%) of the Initial Payment or the Lump Sum Payment, as applicable (the "**Commission**"), to be payable by Seller through escrow, as its sole compensation in connection with the Acquisition. If the Acquisition fails to close for any reason (including the default by any party), Seller shall have no liability to Broker for the Commission or any other payment.

2.      Broker acknowledges that Buyer Parties have no obligation to Broker with respect to the Commission and Broker shall indemnify, protect, defend and hold the Buyer Parties and the Property harmless from and against any and all claims asserted by any of its employees or affiliates for any fees, commissions or other payment in connection with the Acquisition.

3.      Broker agrees to be bound by the confidentiality provisions under Section 11.19 of the Purchase Agreement.

4.      Broker represents and warrants that it is a duly licensed real estate broker in the State of California, and that it and the person or persons executing this certificate on behalf of it have the power and authority to execute this Joinder.

5.      Broker only represents the Seller in connection with the transaction contemplated by the Purchase Agreement.

Very truly yours,

Dated: _____, 201[__]

_____
[_____]

<u>EXHIBIT LIST</u>

| | | |
|---|---|---|
| "A" | - | Description of Land |
| "B" | - | Assumed Contracts |
| "C" | - | Form of Deed |
| "D" | - | Form of Bill of Sale |
| "E" | - | Form of Seller's Closing Certificate |
| "F" | - | Form of Buyer's Closing Certificate |
| "G" | - | Leases |
| "H" | - | Litigation |
| "I" | - | Service Agreements |
| "J" | - | Environmental Reports |
| "K" | - | Sale Order |
| "L" | - | Sale Procedures Order |

## EXHIBIT "A" - DESCRIPTION OF LAND

Real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

PARCEL B OF PARCEL MAP L.A. NO. 1999-3180, IN THE CITY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK 304 PAGES 12 THROUGH 14 INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. SAID LAND IS SHOWN AS A PORTION OF:

LOT 1 OF TRACT NO. 26433, IN THE CITY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK 684 PAGES 27 AND 28 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

## EXHIBIT "B" - ASSUMED CONTRACTS

None

## EXHIBIT "C" - FORM OF DEED

**RECORDING REQUESTED BY AND**
**WHEN RECORDED RETURN TO:**

**AND MAIL TAX STATEMENTS TO:**

APN: _____

---

DOCUMENTARY TRANSFER TAX $_____
__ Computed on the consideration or value of property conveyed;
OR
__ Computed on the consideration or value less liens or encumbrances
    remaining at time of sale.

       The tax has been determined by the undersigned grantor

---

### GRANT DEED

    FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
_____, a _____, does hereby GRANT to
_____, a _____ , all of that
certain real property in the City of _____, County of_____, State of
California, as more particularly described in Exhibit "A" attached hereto and made a part hereof.

    IN WITNESS WHEREOF, Grantor has caused this instrument to be executed on this
_____ day of _____, 20__.

"GRANTOR"

_____
a Delaware _____

By:    _____
Name:  _____
Title: _____

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                    )

County of_____)


On _____ before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature _____ (Seal)

## EXHIBIT "D" - FORM OF BILL OF SALE

For good and valuable consideration, the receipt of which is hereby acknowledged, _____, a _____ ("Seller"), does hereby sell, transfer, and convey to _____, a _____ ("Buyer") any and all personal property owned by Seller, except for that certain personal property listed in the attached Schedule 1, and used exclusively in connection with the operation of that certain real property more particularly described in Exhibit "A" attached hereto (the "Personal Property"), as such Personal Property is more particularly described in the attached Schedule 2.

Seller has executed this Bill of Sale and **BARGAINED, SOLD, TRANSFERRED, CONVEYED and ASSIGNED** the Personal Property and Buyer has accepted this Bill of Sale and purchased the Personal Property **AS IS AND WHEREVER LOCATED, WITH ALL FAULTS AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF WHATSOEVER NATURE, EXPRESS, IMPLIED, OR STATUTORY, EXCEPT AS EXPRESSLY SET FORTH IN THE AGREEMENT OF SALE AND PURCHASE BETWEEN SELLER, _____ AND BUYER _____, DATED AS OF _____, 2015 (the "PURCHASE AGREEMENT") AND THE WARRANTIES SET FORTH HEREIN, IT BEING THE INTENTION OF SELLER AND BUYER TO EXPRESSLY NEGATE AND EXCLUDE ALL WARRANTIES WHATSOEVER, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, ANY RIGHTS OF BUYER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION, ANY CLAIM BY BUYER FOR DAMAGES BECAUSE OF DEFECTS, WHETHER KNOWN OR UNKNOWN WITH RESPECT TO THE PERSONAL PROPERTY, WARRANTIES CREATED BY AFFIRMATION OF FACT OR PROMISE AND ANY OTHER WARRANTIES CONTAINED IN OR CREATED BY THE UNIFORM COMMERCIAL CODE AS NOW OR HEREAFTER IN EFFECT IN THE STATE IN WHICH THE PERSONAL PROPERTY IS LOCATED, OR CONTAINED IN OR CREATED BY ANY OTHER LAW.**

66

Dated this _____ day of _____, 2015.


**SELLER:**                                    _____


                                               By: _____
                                               Name: _____
                                               Title: _____

**BUYER:**                                     _____


                                               By: _____
                                               Name: _____
                                               Title: _____

Exhibit "A" to Bill of Sale

## Description of Real Property

Schedule 1 to Bill of Sale

## Excluded Property

Schedule 2 to Bill of Sale

List of Personal Property

**EXHIBIT "E" - FORM OF SELLER'S CLOSING CERTIFICATE**

THIS SELLER CERTIFICATION (this "Certification") is made as of the ____ day of _____, 2015, by _____, a _____ ("Seller"), to _____, a _____ ("Buyer").

R E C I T A L S:

A.    Pursuant to that certain Purchase and Sale Agreement dated as of _____, 2015 between Seller and Buyer or its respective predecessor-in-interest (together with all amendments and addenda thereto, the "Agreement"), Seller has agreed to sell to Buyer that certain property commonly known as "Holy Hill Community Church".

B.    The Agreement requires the delivery of this Certification.

NOW THEREFORE, pursuant to the Agreement, Seller does hereby represent and warrant to Buyer that:

1.    Except as specifically set forth below, each and all of the representations and warranties of Seller contained in the Agreement are true and correct as of the date hereof as if made on and as of the date hereof.

2.    This Certification is subject to the terms and conditions of the Agreement.

[Signatures on following page]

71

IN WITNESS WHEREOF, the undersigned has executed this Certification as of the day and year first above written.

**SELLER:**

[_____],
a [_____]

By:_____

Name:
Title:

## EXHIBIT "F" - FORM OF BUYER'S CLOSING CERTIFICATE

THIS BUYER CERTIFICATION (this "Certification") is made as of the ____ day of _____, 2015, by _____, a _____ ("Buyer"), to _____, a _____ ("Seller").

### R E C I T A L S:

A.     Pursuant to that certain Purchase and Sale Agreement dated as of _____, 2015 between Seller and Buyer or its respective predecessor-in-interest (together with all amendments and addenda thereto, the "Agreement"), Seller has agreed to sell to Buyer that certain property commonly known as "Holy Hill Community Church".

B.     The Agreement requires the delivery of this Certification.

NOW THEREFORE, pursuant to the Agreement, Buyer does hereby represent and warrant to Seller that:

1.     Except as specifically set forth below, each and all of the representations and warranties of Buyer contained in the Agreement are true and correct as of the date hereof as if made on and as of the date hereof.

2.     This Certification is subject to the terms and conditions of the Agreement.

[Signatures on following page]

73

IN WITNESS WHEREOF, the undersigned has executed this Certification as of the day and year first above written.

**BUYER:**

[_____],
a [_____]


By:_____

Name:
Title:

74

## EXHIBIT "G" – LEASES

1.  Communications Site Lease Agreement, dated as of October 12, 2007, by and between Royal
    Street Communications California, LLC and Holy Hill Community Church

2.  Site Lease with Option, dated as of October 3, 2007, by and between Holy Hill Community
    Church and Omnipoint Communications Inc., a subsidiary of T-Mobile USA Inc.

## EXHIBIT "H" – LITIGATION

1. *Rosenberg v. Holy Hill Community Church*, LASC Case No. BC389566

2. *Holy Hill Community Church v. Simi Valley Shopping Center*, LASC Case BC321267

3. *1111 Sunset Blvd, LP v. Holy Hill*, LASC Case No. BC440813

4. *Western California Presbytery v. Dong Sub Bang*, LASC Case No. BC459793

5. *Holy Hill Community Church, et al. v. JB Sunset Partnership, et al.*, LASC Case No. BC489602

6. *Holy Hill Community Church v. La Sa-Rang Community Church, et al.*, LASC Case No. BC487186

7. *Shepherd University v. Holy Hill Community Church, et al.*, LASC Case No. BC475054

8. *Holy Hill Community Church v. Beverly Hills Real Estate Invest, et al.*, LASC Case No. 469681

9. *HHCC v. Bar Zemer*, LASC Case No. BC520596

10. *Wilshire Escrow Company v. HHCC, et al.*, LASC Case No. BC537444

11. *HHCC v. Parker Shumaker Mills et al.*, LASC Case No. BC542024

12. *Dana Park v. Holy Hill*, LASC Case No. BC558483 (removed to Bankruptcy Court as Adversary Proceeding No. 2:14-ap-01744-WB)

## EXHIBIT "I" - SERVICE AGREEMENTS

1.   Oral agreement with Peter Lee MGMT, LLC to provide security and property maintenance and management services.

# EXHIBIT "J" - ENVIRONMENTAL REPORTS

1. Preliminary Geotechnical Report, dated October 13, 2014, prepared by Feffer Geological Consulting

## EXHIBIT "K" - SALE ORDER

*[Attached]*

## EXHIBIT "L" - SALE PROCEDURES ORDER

*[Attached]*

# EXHIBIT B

1              UNITED STATES BANKRUPTCY COURT

2       CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES

3                  --oOo--

4  In Re:              )  Case No. 2:14-bk-21070-WB
                     )
5  HOLY HILL COMMUNITY CHURCH   )  Chapter 11
                     )  Los Angeles, California
6  Debtor,            )
                     )  Thursday, April 9, 2015
7  ----------------------------X  10:00 A.M.

8

9                            MOTION FOR AN ORDER:
                            (1) APPROVING PROCEDURES
10                        IN CONNECTION WITH THE
                        PROPOSED SALE OF PROPERTY
11                        OF THE ESTATE;
                        (2) APPROVING STALKING
12                        HORSE BID PROTECTIONS;
                        (3) APPROVING ADVANCE FROM
13                        STALKING HORSE BIDDER; AND
                        (4) APPROVING THE FORM AND
                        MANNER OF NOTICE

14

15               TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE JULIA BRAND
16          UNITED STATES BANKRUPTCY JUDGE

17  <u>APPEARANCES</u>:

18  For the Debtor:         RICHARD T. BAUM, ESQ.
                        Law Offices of Richard T. Baum
19                    11500 West Olympic Boulevard
                      Suite #400
20                    Los Angeles, California  90064

21  For the Debtor:         W. DAN LEE, ESQ.
                        Lee Law Offices
22                    5670 Wilshire Boulevard
                      Suite #2150
23                    Los Angeles, California  90036

24

25  Proceedings produced by electronic sound recording;
    transcript produced by transcription service.


P 888.272.0022  F 818.343.7119  BENHYATT  www.benhyatt.com
Certified Deposition Reporters

```
 1   For the Chapter 11        ARAM ORDUBEGIAN, ESQ.
     Trustee:                  Arent Fox, LLP
 2                             555 West Fifth Street, 48th Floor
                               Los Angeles, California  90013
 3
     For 1111 Sunset, LLC:     BERNARD D. BOLLINGER, JR., ESQ.
 4                             Buchalter Nemer
                               1000 Wilshire Boulevard
 5                             Suite #1500
                               Los Angeles, California  90017
 6
     For the Metropolitan      MATTHEW LESNICK, ESQ.
 7   Water District:           Lesnick Prince & Pappas, LLP
                               185 Pier Avenue
 8                             Suite #103
                               Santa Monica, California  90405
 9
     For Parker Mills, LLP;    VICTOR SAHN, ESQ.
10   Law Offices of Carl       333 South Hope Street
     Sahn:                     35th Floor
11                             Los Angeles, California  90071

12   For Andrew Kim; Jong      J. SCOTT BOVITZ, ESQ.
     Chun Suh:                 Bovitz & Spitzer
13                             1100 Wilshire Boulevard
                               Suite #2403
14                             Los Angeles, California  90017

15   Court Recorder:           Tren W./Sandra B.
                               U.S. Bankruptcy Court
16                             Central District of California
                               Edward R. Roybal Federal Building
17                                and Courthouse
                               255 East Temple Street, Room #940
18                             Los Angeles, California  90012
                               (855) 460-9641
19
     Court Transcriptionist:   Ruth Ann Hager, C.E.T.**D-641
20                             Ben Hyatt Certified Deposition
                                  Reporters
21                             17835 Ventura Boulevard, Suite 310
                               Encino, California  91316
22

23

24

25
```



P 888.272.0022  F 818.343.7119    BENHYATT    www.benhyatt.com
Certified Deposition Reporters

82

Page                                                                          3

1           LOS ANGELES, CALIFORNIA, THURSDAY, APRIL 9, 2015

2                              10:15 A.M.

3                              --oOo--

4           THE COURT:  All right.  #5.00, Holy Hill

5   Community Church.

6           MR. BAUM:  Good morning, Your Honor.  Richard

7   Baum on behalf of the debtor Holy Hill Community Church.

8           MR. LEE:  Good morning, Your Honor.  Dan Lee on

9   behalf of the debtor Holy Hill Community Church.

10          MR. ORDUBEGIAN:  Good morning, Your Honor.  Aram

11  Ordubegian of Arent Fox on behalf of the Chapter 11 Trustee

12  Richard Laski.  Mr. Laski is also present in the courtroom.

13          THE COURT:  All right.

14          MR. BOLLINGER:  Good morning, Your Honor.

15  Bernard Bollinger, Buchalter Nemer, on behalf of 1111

16  Sunset, LLC.

17          MR. LESNICK:  Good morning, Your Honor.  Matthew

18  Lesnick, Lesnick Prince & Pappas on behalf of the

19  Metropolitan Water District.

20          MR. OTAKI:  Good morning, Your Honor.  Brian

21  Otaki of the Metropolitan Water District.

22          MR. SAHN:  Your Honor, good morning.  Victor Sahn

23  of SulmeyerKupitz for Parker Mills, LLP, and the Law

24  Offices of Carl Sohn, secured creditors.

25          MR. BOVITZ:  Good morning.  J. Scott Bovitz,

Page                                                                                    4

1  Bovitz & Spitzer on behalf of Pastor Suh and Elder Andrew

2  Kim.

3              THE COURT:  All right.  Mr. Ordubegian.

4              MR. ORDUBEGIAN:  Thank you, Your Honor.  We are

5  here today on a motion to approve bid procedures and to

6  choose our stalking horse bidder.  As Your Honor knows, we

7  filed an extensive reply, an omnibus reply describing the

8  fact that the original stalking horse bidder agreed to do a

9  deal which allowed 1111 Sunset, who's represented by

10  Mr. Bollinger here today, to exercise their first right of

11  refusal.  That first right of refusal was elected.  1111

12  Sunset on top of choosing to proceed also included certain

13  enhancements that the Trustee believes are very favorable

14  for the estate's creditors and we're basically here asking

15  that the motion be granted and allowing 1111 Sunset to be

16  the stalking horse bidder so that we can start the auction

17  process and, if Your Honor allows it, have an auction in

18  your courtroom on May 21st.

19              There is an objection from the debtor regarding

20  primarily the amount of a deposit.  Your Honor, we replied

21  to that.  I guess it's probably better to hear from them

22  first, but if Your Honor has any questions, et cetera,

23  we're happy to address those.

24              THE COURT:  All right.  Well, let's hear first

25  from the debtor.

Page                                                                    5

1          MR. BAUM:   Thank you, Your Honor.   I think that

2    the bid that has been received from 1111 Sunset goes a long

3    way to resolving the issues that were raised by the

4    debtor's objections.   We have a way of determining apples

5    and oranges here depending upon whether it's a straight

6    cash deal or a cash and development deal.

7          With regard to the issue of the deposit, since

8    there is a liquidated damage provision in the 1111 Sunset

9    deal of three million dollars, we think that the best thing

10   to do would be to have that three million-dollar amount be

11   the required deposit for bidding.   Three million dollars

12   would be approximately 16 percent or so of the amount that

13   was bid for the property of 18.5 million dollars.

14          For it to be ten million dollars we're talking

15   now about a deposit of over 50 percent and I think that

16   will dissuade potential bidders from coming forward and

17   saying, yes, I would like to buy this property.   Three

18   million dollars is a lot of money.   It's not something that

19   too many people who are dilettantes or coming in here fly-

20   by-night are going to be able to have.   Unless you've got

21   three million dollars down, you're not going to be heard in

22   this courtroom.   But three million dollars is a substantial

23   amount.   It covers the liquidated damages and it shows that

24   a buyer is willing to go forward.

25          Ten million dollars by contrast would probably

P 888.272.0022  F 818.343.7119     BENHYATT
Certified Deposition Reporters     www.benhyatt.com

Page                                                                              6

1  require most buyers to either drain their bank account or

2  come and borrow the money, even for a very short time, and

3  that could cost them a point for five days' worth of

4  deposit because then they lose the bid and they come back.

5           So I don't really see that there's any great

6  benefit to ten million dollars, other than to make it less

7  likely that somebody is going to come forward to this court

8  and say, I want to bid; here's my money; here's how I

9  intend to do it; and otherwise qualify with the Trustee

10  because the Trustee will be looking at the finances of the

11  person coming forward in order to accept or not accept a

12  bid.  And that would be my point on the issue.  Thank you,

13  Your Honor.

14          THE COURT:  All right.  Thank you.

15          MR. BOVITZ:  J. Scott Bovitz for Pastor Suh and

16  Elder Kim.  We always have the issue of who's in charge

17  and, Your Honor, Pastor Suh and Elder Kim do not think that

18  Mr. Lee or Mr. Baum can speak on behalf of Holy Hill

19  Community Church.  And in fact, today I'll be filing a

20  declaratory relief complaint with respect to that.

21          But for purposes of today, we agree.  Mr. Baum is

22  right on the money, that is, three million dollars would

23  not chill bidding.  We think that's appropriate.  We also

24  know there's a lot of moving parts in connection with this.

25  We wonder if the Court should actually fix a hard date or

Page                                                                        7

1  should have some flexibility in case there's a need for a

2  continuance, in case there's diligence and other things

3  that need to happen because there's going to be excess here

4  for point of declaratory relief complaint of who's in

5  charge of the excess going forward and what cooperation

6  does the Trustee need to continue the status as a church

7  and so forth.  So for the moment the factions are alive

8  with respect to this.

9          THE COURT:  All right.  All right.

10 Mr. Ordubegian -- well, let me first toss out three things.

11 First is I'm concerned about the ten million dollars.  I

12 think it's too much.  I think it chills bidding to require

13 more than 50 percent of the deposit and the only reason you

14 gave me is because, well, they did it.  I think it chills

15 bidding.  So I think that's really high.

16          Second, I'm concerned about a break-up fee.  I'm

17 not sure why we need a break-up fee where there's been a

18 right of first refusal accepted and these guys are going

19 to -- you know, going forward anyway.  It's not like they

20 need to be incentivized to be the stalking horse bidder, so

21 that's number two.

22          Number three, I want to hear how you're going to

23 advertise this sale.  I didn't see a brok -- a declaration

24 from your broker about how many people they talked to, et

25 cetera, et cetera, et cetera.  How are you going to get it

Page                                                                          8

1   out there so we actually have bidders who are coming?

2          And then the fourth thing is, is I want to pick a

3   day that's not my regular Chapter 11 hearing day.

4          MR. ORDUBEGIAN:  Your Honor, I guess let me hit

5   the easiest one first, whether or not this has been

6   advertised.  Your Honor, we hired CBRE.  They have been

7   doing email blasts and putting it on the MLS and we have

8   gotten 40, 50 different bidders that have discussed these

9   issues with us.  We've already prepared a declaration that

10  will be attached to the sale motion that will list all that

11  out.

12         The fact that this property is for sale is not

13  really a secret to anybody that's been involved, even pre-

14  bankruptcy.  So a lot of the people, the developer types

15  that have been interested have known about it and they are

16  all itching to start this process.  And on the -- let's

17  just say the church side, the various factions themselves

18  have introduced us to a number of bidders.  And, Your

19  Honor, we do discuss that in our papers, especially related

20  to why we believe the ten million dollars is a good number.

21         Main reason -- but, Your Honor, of course, if

22  Your Honor decides it should be lower, we obviously respect

23  that.  The reason we wanted a big number and now two

24  bidders, the original stalking horse and 1111 Sunset have

25  both said that's fine, is because that throughout the

Page                                                                      9

1   process there have been a number of potential buyers who

2   have been, for lack of a better word, just flakes.  And

3   this specific fact pattern in this case does not have the

4   room to have someone who's going to fall out of escrow once

5   again.  That happened several times pre-bankruptcy.  The

6   Trustee studied that, not only buyers, but also potential

7   refinancing entities.

8           So we want -- especially now that we have a lump

9   sum option as well, we want to make sure the bidder is

10  real, that they can actually close within 30 days, which is

11  what the PSA says, so that's why -- that's why the ten

12  million dollars just sounded right to us.  Like I said,

13  Your Honor, if you'd like to reduce it, we understand that,

14  but we didn't just pick the number out of the clear blue

15  sky.

16          Your Honor, the break-up fee has been

17  substantially reduced.  I know Mr. Bollinger, I'm sure,

18  will want to address that.  The prior break-up fee was

19  north of a million dollars.  It was $750,000 for the break-

20  up fee itself, plus another $400,000 for an expense

21  reimbursement.  Your Honor, Mr. Laski and I, we were at a

22  meeting in New York with the financier where we told them,

23  "That number is outrageous.  The Judge is not going to

24  approve something like that," but they said, "This is what

25  we require."  That was the original break-up fee.

Page                                                                    10

1          But, Your Honor, the new break-up fee, the

2   enhancement, as we've called it, is very reasonable.  It's

3   well within the one to three percent range that exists out

4   there.  And the reality is the current buyer, 1111 Sunset,

5   is doing a number of due diligence and environmental

6   reporting as we speak right now and they are going to be

7   turning that over to be shared with other buyers.  So

8   though they are participants, though they're on the

9   property, they are adding value to the process.

10         Again, Your Honor, if Your Honor decides to

11  reduce the break-up fee, eliminate it or reduce the

12  deposit, we completely respect that but I just wanted to

13  make sure Your Honor knew that those were the moving parts

14  that we've tried to weave into the motion and the reply.

15         THE COURT:  All right.

16         MR. BOLLINGER:  Your Honor, the issue that's most

17  relevant to my client, of course, is the breakup fee and I

18  did want to make clear that that break-up fee is inclusive

19  of expenses that are incurred and there will be significant

20  amount of expenses that are incurred for this environmental

21  report.  It's being done on an expedited basis.  They're

22  drilling I think to get that done, so it will get done

23  before the sale.

24         There will be fees associated with doing the

25  documentation of the PSA, et cetera, that will be included



Page                                                                          11

1  in that break-up fee.  Any other buyer would get that sort

2  of consideration in this circumstance and, of course, it

3  will only be made if my client is not the ultimate

4  purchaser of the property in which case the auction itself

5  will have benefitted the estate because of the incremental

6  increase in the bids that have occurred.  So we submit that

7  that amount is reasonable, particularly when you take into

8  consideration that the expenses are included in that

9  amount.

10          And as far as the ten million-dollar break-up

11  fee, the bid amount goes, we deposited that amount.  One of

12  the significant issues we think is that there is a very

13  short closing date from the date of the auction and I think

14  it was 30 days.  And so if there's a big disparity between

15  the deposited amount and the sale -- and the purchase

16  price, there's a significant risk that there will not be a

17  sale that closes.  And given the history of this case

18  that's been our concern.

19          THE COURT:  All right.

20          MR. SAHN:  Your Honor, very briefly, two points.

21  The first is that while the sale proceeds or the sale

22  amount, purchase price is sufficient to pay creditors in

23  full, we still have the bird in the hand and I want to be

24  mindful of that because we were a great distance from where

25  we are now eight or nine or ten months ago when this case

Page                                                                          12

1   started and I don't want that to be -- I know it isn't

2   forgotten, but I want to be sure that what we've gotten

3   here has been a process and it's not been easy.

4         The second thing, and Mr. Ordubegian tells me

5   it's a sale issue, the very significant thing that this

6   offer, the initial offer has done is it has brought forward

7   a buyer who was going to be causing other potential buyers

8   to buy this property and purchase litigation because

9   Mr. Bollinger's client has the easement on this property

10   and that easement litigation issue goes away with

11   Mr. Bollinger's client as the buyer.  That is a huge issue

12   and a huge advantage that their offer in the way that it is

13   structured brings to the table.

14         They've done that and they have improved upon the

15   break-up fee and the overbid amount that was provided for

16   in the initial offer, even though they're taking that

17   enormous issue off the table, at least as to their offer.

18         So I think these are advantages to the estate

19   that normal buyers typically don't bring and that may

20   justify, in my mind, Your Honor erring on the side of doing

21   a little bit more than you might typically want to do in a

22   typical sale because this is not a buyer doing what normal

23   buyers typically do, which is just come, make an offer and

24   try to up these numbers as high as they can to keep other

25   buyers away.  They're actually bringing a lot of value

Page                                                                    13

1   behind it and I think that value is -- should be respected

2   and should be approved by the Court.

3           THE COURT:  All right.  Thank you.  Anybody else

4   have anything they want to talk about?  Metropolitan Water

5   District.

6           MR. LESNICK:  I'm sorry?

7           THE COURT:  Metropolitan Water District.

8           MR. LESNICK:  Metropolitan Water District.  Thank

9   you, Your Honor.  Matt Lesnick.  Just one thing very -- a

10  smaller detail, I suppose.  In reviewing the purchase and

11  sale agreement, we notice that there was some language that

12  we thought was a little bit unclear regarding certain --

13  whether certain litigation rights were being included in

14  the sale.  And in particular, what Metropolitan Water

15  District is concerned about is whether the litigation

16  that's pending but currently stayed that was brought by the

17  debtor pre-bankruptcy against the budget parties, including

18  the Metropolitan Water District, relating to whether the

19  debtor had any remaining rights, purchased option, for

20  example, with respect to a parking garage located across

21  the street that's owned by Metropolitan Water District,

22  across the street from the property that's being sold

23  whether those litigation rights were being sold in

24  connection with this purchase.

25          And I've spoken with the Trustee about it,



Page                                                                    14

1   Trustee's counsel about it, and my understanding is that

2   the intention is that the litigation rights are not being

3   sold.  But I think in the interest of making sure that any

4   potential buyer understands exactly what's included in the

5   sale and what's not to avoid future disputes, litigation in

6   which Metropolitan Water District would undoubtedly be

7   caught in the middle that we've suggested that certain

8   language be inserted into the purchase and sale agreement

9   to clarify that those -- that litigation claim was not

10  included in the sale.

11          THE COURT:  All right.  Thank you.

12          Mr. Ordubegian or Bollinger.

13          MR. BOLLINGER:  Your Honor, we did our best to

14  keep the existing PSA the same and to not deal with all

15  these separate issues, to assert them into the PSA.  We did

16  not discuss this issue with Metropolitan Water District and

17  I know my client isn't interested in putting that into the

18  PSA.  It may well be that in the future once we've

19  discussed this issue with them that we can put it in the

20  proposed sale order or something else that makes it very

21  clear to any purchaser that that issue is not involved.

22  But as we stand here today, it's not in the PSA and I'm not

23  prepared to authorize the change in the PSA in the matter

24  they're requesting.

25          THE COURT:  All right.  All right.



Page                                                              15

1 | Mr. Ordubegian, what do you think about this issue?  I

2 | mean, is there going to be confusion or, you know, anything

3 | that's going to cause a glitch in the sale process if it's

4 | not clarified that that litigation over the garage across

5 | the street is not included?

6 |          MR. ORDUBEGIAN:  Your Honor, I'm not quite sure

7 | it's quite all that confusing the way it is now, but what

8 | I've spoken to Mr. Lesnick about is put a provision like

9 | that in the template PSA that we're going to be putting up

10 | on CBRE's website for overbidders to use to submit their

11 | bid four or five days prior to the auction and, hopefully,

12 | that deals with it.

13 |          The sale motion, which is being drafted, is

14 | really the place where you zero in on what the specific

15 | assets are and what specific assets are not being sold.  So

16 | I'll work closely with Mr. Lesnick to try and resolve

17 | those, along with Mr. Bollinger, to make sure that it's as

18 | clear as possible in the sale motion.

19 |          THE COURT:  All right.  Mr. Lesnick, did you have

20 | something else to say?

21 |          MR. LESNICK:  The procedures all sound fine,

22 | although if the current purchase and sale agreement with

23 | 1111 Sunset that's been filed turns out to be other than

24 | the price to be the prevailing bid, then we'll have the

25 | current language in there.  I guess what I'm saying is, the

Page                                                                      16

1  easiest way to resolve this is, if the Trustee is not

2  intending to sell the litigation rights then we could just

3  say that on the record right now and make it clear that

4  that's not included.

5          MR. ORDUBEGIAN:  Your Honor, I have to confer

6  with the Trustee very quickly.

7          THE COURT:  All right.

8          MR. ORDUBEGIAN:  If I can.

9          (Pause)

10         Your Honor, we are not selling the litigation

11  rights.  It wasn't part of the original PSA or the new 1111

12  Sunset PSA so that we'd just state that on the record.

13         THE COURT:  All right.

14         MR. ORDUBEGIAN:  And we will do our best to

15  clarify that going forward.

16         THE COURT:  All right.  I think that's fine.  All

17  right.

18         So I'm going to approve the bid procedures

19  motion.  I'm going to approve the break-up fee of $350,000,

20  I think, based on information and statement of counsel

21  today that it includes expenses and the statements of Mr.

22  Sahn as well that there's additional value brought to this

23  transaction.  And I know environmentally torts are not

24  inexpensive.  So I'm going to approve the break-up fee.

25         I do think that the deposit is too high and so

Page                                                                              17

1   I'm going to set the deposit amount at four million

2   dollars, which is still a significant chunk of money for

3   bidders.  And other than that, I'm going to approve the

4   motion.  You need to pick a date for your sale hearing

5   which --

6            MR. ORDUBEGIAN:  Your Honor, what are some

7   available dates?

8            THE COURT:  Well, I was going to suggest instead

9   of May 21st that we have it on May 22nd, which is a Friday

10  and it's an open day on the Court's calendar because

11  sometimes these auctions take time.

12           MR. ORDUBEGIAN:  This auction will take time,

13  Your Honor.

14           THE COURT:  So that's why I think that I can't

15  put it on the day that we have regular hearings.

16           MR. ORDUBEGIAN:  Understood, Your Honor.

17           THE COURT:  So 22nd, 27th, 29th, those dates are

18  all available.

19           MR. BOVITZ:  I'm not available on the 27th or the

20  29th, Your Honor.

21           THE COURT:  All right, then.   22nd is fine?

22           MR. ORDUBEGIAN:  22nd is fine, especially since

23  it's my wife's birthday that day, so --

24           THE COURT:  All right.  We all start at 10:00

25  o'clock.  Yes, 10:00 o'clock.

Page                                                                18

1          MR. ORDUBEGIAN:  Your Honor, Mr. Bollinger

2   reminded me.  One of the reasons we picked the 21st also

3   was we have a status conference on the 21st.  I think maybe

4   one other matter.  Can we move everything over to the 22nd?

5          THE COURT:  Yes.

6          MR. ORDUBEGIAN:  Great.  We'll do a stip.  Is

7   that how Your Honor wants it?

8          THE COURT:  What do we have -- let me see what we

9   have that day.

10          MR. ORDUBEGIAN:  I think it might just be a

11   status conference, in which case maybe --

12          THE COURT:  We'll just continue it --

13          MR. ORDUBEGIAN:  Yes, Your Honor.  It's just a

14   status conference.

15          THE COURT:  All right.  So I'm just -- well, you

16   don't need to do anything.

17          MR. ORDUBEGIAN:  Okay.

18          THE COURT:  I will move it to the 22nd.

19          MR. ORDUBEGIAN:  Thank you, Your Honor.  Oh,

20   10:00 o'clock.  Right, Your Honor?

21          THE COURT:  10:00 o'clock.

22          MR. ORDUBEGIAN:  10:00 o'clock.

23          THE COURT:  All right.  We've got it.  All right.

24   So is there anything else that we need to accomplish today?

25   All right, then.  Thank you.

Page                                                                          19

1            ATTORNEYS:  Thank you, Your Honor.

2    (End at 10:39 a.m.)

3                    *  *  *  *  *  *  *  *

4            I certify that the foregoing is a

5    correct transcript from the electronic sound recording of

6    the proceedings in the above-entitled matter.

7

8    _____       Date:  11/3/2015

9

10   RUTH ANN HAGER, C.E.T.**D-641

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P 888.272.0022  F 818.343.7119     BENHYATT     www.benhyatt.com
Certified Deposition Reporters

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Aram Ordubegian (SBN 185142)<br>Andy S. Kong (SBN 243933)<br>**ARENT FOX LLP**<br>555 West Fifth Street, 48th Floor<br>Los Angeles, CA 90013-1065<br>Telephone: 213.629.7400<br>Facsimile:  213.629.7401<br>aram.ordubegian@arentfox.com<br>andy.kong@arentfox.com<br><br>*Attorney for Plaintiff Richard J. Laski, Principal of Reorganized Debtor* | |

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

</div>

| In re:<br>**HOLY HILL COMMUNITY CHURCH,** | CASE NO.: 2:14-bk-21070-WB<br><br>CHAPTER: 11 |
|---|---|
| <br><br>Reorganized Debtor | ADVERSARY NUMBER: |
| <br>**RICHARD J. LASKI,** Principal of Reorganized Debtor,<br><br><br>Plaintiff(s)<br><br>Versus<br><br>**PALISADES CAPITAL PARTNERS, LLC, 1111 SUNSET BOULEVARD, LLC, 1111 SUNSET, LLC, DOWNTOWN CAPITAL, LLC, METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA,**<br><br>Defendant(s) | <div align="center"><br>**SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]**</div> |

TO THE DEFENDANT: A Complaint has been filed by the Plaintiff against you. If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint. You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page. The deadline to file and serve a written response is _____. If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| | |
|---|---|
| **Hearing Date:** _____<br>**Time:** _____<br>**Courtroom:** <u>1375</u> | **Place:**<br>☒ 255 East Temple Street, Los Angeles, CA 90012<br>☐ 3420 Twelfth Street, Riverside, CA 92501<br>☐ 411 West Fourth Street, Santa Ana, CA 92701<br>☐ 1415 State Street, Santa Barbara, CA 93101<br>☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.** All parties must read and comply with the rule, even if you are representing yourself. You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference. A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS. REPORT.ATTACH). If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference. **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

**KATHLEEN J. CAMPBELL**
**CLERK OF COURT**

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
          Deputy Clerk

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2012*                                Page 2                    **F 7004-1.SUMMONS.ADV.PROC**
AFDOCS/12915926.1

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Richard J. Laski, Principal of Reorganized Debtor | DEFENDANTS<br>Palisades Capital Partners, LLC, 1111 Sunset Boulevard, LLC,<br>1111 Sunset, LLC, Downtown Capital, LLC, Metropolitan<br>Water District Of Southern California |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Andy S. Kong<br><br>**Arent Fox LLP**<br>555 West Fifth Street, 48th Floor<br>Los Angeles, CA 90013-1065<br>(213) 629-7400 | ATTORNEYS (If Known)<br><br>Jeffrey Krieger *(Atty for Palisades Capital Partners, LLC and 1111 Sunset Boulevard, LLC)*<br>**Greenberg Glusker Fields Claman & Machtinger LLP**<br>1900 Avenue of the Stars, 21st Floor<br>Los Angeles, California 90067<br>(310) 785-6869<br><br>Bernard Bollinger *(Atty for 1111 Sunset, LLC and Downtown Capital, LLC)*<br>**Buchalter Nemer**<br>1000 Wilshire Boulevard, Suite 1500<br>Los Angeles, California 90017<br>(213) 891-5009<br><br>Matthew A. Lesnick *(Atty for Metropolitan Water District of Southern California)*<br>**Lesnick Prince & Pappas LLP**<br>185 Pier Avenue, Suite 103<br>Santa Monica, California  90405<br>(310) 396-0964 |
| PARTY (Check One Box Only)<br>☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☒ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor  ☒ Other<br>☐ Trustee |

| CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)<br>Declaratory relief under 28 U.S.C. § § 2201 and 2202 |
|---|

| **NATURE OF SUIT** |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |

AFDOCS/12915360.1

American LegalNet, Inc.
www.FormsWorkFlow.com

B1040 (FORM 1040) (12/15)

**FRBP 70 01( 1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 70 01 (2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001( 3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/ Revocation of Discharge**
- ☐ 41-Objection/re vocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 6 6 -Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 70 01(6) – Dischargeability (continued)**
- ☐ 61 -Dischargeability- §523(a)(5 ), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 6 5 -Dischargeability - other

**FRBP 70 01(7) – Injunctive Relief**
- ☐ 71 -Injunctive relief- imposition of stay
- ☐ 72-Injunctive relief - other

**FRBP 70 01(8) Subordination of Claim or Interest**
- ☐ 81 -Subordination of claim or interest

**FRBP 70 01(9) Declaratory Judgment**
- ☒ 91 -Declaratory judgment

**FRBP 70 01(10) Deter mi nation of Remove d Act ion**
- ☐ 01 -Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

---

☐ Check if this case involves a substantive issue of state law

☐ Check if this is asserted to be a class action under FRCP 23

---

☐ Check if a jury trial is demanded in complaint

☐ Demand $

---

Other Relief Sought

American LegalNet, Inc.
www.FormsWorkFlow.com

B1040 (FORM 1040) (12/15)

<table>
<tr><td colspan="3" align="center"><strong>BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES</strong></td></tr>
<tr><td>NAME OF DEBTOR<br>Holy Hill Community Church</td><td colspan="2">BANKRUPTCY CASE NO.<br>2:14-bk-21070-WB</td></tr>
<tr><td>DISTRICT IN WHICH CASE IS PENDING<br>United States Bankruptcy Court-Central District</td><td>DIVISION OFFICE<br>Los Angeles</td><td>NAME OF JUDGE<br>Julia W. Brand</td></tr>
<tr><td colspan="3" align="center"><strong>RELATED ADVERSARY PROCEEDING (IF ANY)</strong></td></tr>
<tr><td>PLAINTIFF<br>Holy Hill Community Church</td><td>DEFENDANTS<br>Yuval Bar-Zemer, <em>et. al.</em></td><td>ADVERSARY<br>PROCEEDING NO.<br>2:15-ap-01467-WB</td></tr>
<tr><td>DISTRICT IN WHICH ADVERSARY IS PENDING<br>United States Bankruptcy Court-Central District</td><td>DIVISION OFFICE<br>Los Angeles</td><td>NAME OF JUDGE<br>Julia W. Brand</td></tr>
<tr><td colspan="3">SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br><em>/s/ Andy S. Kong</em><br><br><br><br></td></tr>
<tr><td>DATE<br>2/1/2016</td><td colspan="2">PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Andy S. Kong</td></tr>
</table>

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.